UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  10-CV-80962-LSS

CARL STORK

        Plaintiff,

v.

LYDIAN TRUST COMPANY, a Florida
Corporation, RORY A. BROWN, an individual;
CLARK JOHNSON, an individual, JOHN
PURCELL, an individual; DANIEL STANTON,
an individual

        Defendants

---

### Defendants' Motion for Summary Judgment on Counts I, II, and III of Plaintiff's Complaint, With Incorporated Memorandum of Law

Defendants, LYDIAN TRUST COMPANY, a Florida corporation n/k/a/ Lydian Holding Company ("Lydian"), RORY A. BROWN ("Brown"), CLARK JOHNSON ("Johnson"), an individual, JOHN PURCELL ("Purcell"), an individual and DANIEL STANTON ("Stanton"), an individual (sometimes hereinafter collectively referred to as "Defendants"), pursuant to Federal Rule of Civil Procedure 56 hereby file their Motion for Summary Judgment as to Counts I, II and III of Plaintiff, CARL STORK'S ("Stork") Complaint (DE-1), With Incorporated Memorandum of Law, and state as follows:

### I.    Introduction

This case arises from Stork filing a Three-Count Complaint against Defendants: Count-1 (Breach of Contract Against Lydian), Count-II (Fraud Against Lydian and Brown) and Count-III

(Breach of Fiduciary Duty Against Brown, Johnson, Purcell, and Stanton).[1]   Lydian was the holding company for Lydian Wealth Management (hereinafter "LWM"), a subsidiary, which subsidiary was sold to City National Corporation (hereinafter "CNC") on May 17, 2007 for $125,000,000 (hereinafter, the "Transaction").   Stork currently owns 434,000 shares of Lydian stock. (Id. at ¶14)  As part of the sale of LWM to CNC, Lydian, through management and board action, approved, among other things: (a) the Transaction; (b) bonuses to senior Lydian management who contributed substantial time and services developing LWM and making the Transaction a success; (c) the repurchase of shares of certain LWM employees, clients and/or shareholders who became part of the Transaction; and (d) the repurchase of certain other shareholders' Lydian shares.

Count-I revolves around an <u>unexecuted</u> contract dated April 23, 2007 (DE-1-3, the "Contract") wherein Stork claims Lydian, through Brown, agreed to purchase Stork's shares in Lydian at a purchase price of $17.50 per share on or around August 15, 2007.  Lydian did not purchase Stork's Lydian shares.  Despite Stork's allegations, this Motion will detail that:  (a) Brown did not execute the Contract; (b) the Board never approved this extraordinary transaction (i.e., the Contract); (c)  the Board never gave Brown authority to bind Lydian to the Contract; (d) no apparent, implied or actual authority existed to bind Lydian to the Contract; (e) the Lydian Articles of Incorporation ("AOI") and Bylaws of Lydian ("Bylaws") do not confer authority upon Brown to bind Lydian to the Contract; and (f)  Stork knew the board had to approve the Contract and that such approval was never provided rendering the Contract void.

---

[1] Brown is the CEO and an inside director of Lydian.  Johnson, Purcell and Stanton are outside directors (hereinafter, the "Outside Directors").

Count-II alleges allegations of fraudulent inducement against Lydian and Brown.[2]  Stork claims, among other things, that had he known Brown and Lydian never intended to repurchase his Lydian shares, Stork would have exercised his rights as a shareholder to ". . . protect Lydian from the adverse consequences of the proposed [Transaction]." (DE-1, ¶¶34, 50-53).   As explained herein, Count-II is derivative and could not have been brought based upon the alleged individual harm purportedly sustained by Stork.  Similarly, Count-III for Breach of Fiduciary is against Brown, Johnson, Purcell and Stanton in their capacities as directors.  This claim is also derivative in nature.

In both Counts II and III, Stork alleges, in pertinent part,: that LWM was sold for an inadequate price providing management with a windfall at the expense of Lydian and its shareholders, that Defendants breached their fiduciary duties to treat all shareholders equally and proportionately, that Defendants caused Lydian to repurchase the shares of certain favored shareholders, that Lydian became undercapitalized forcing it to obtain additional capital thus severely diluting the remaining shareholders, that the Transaction, together with subsequent payments of cash to insiders, damaged Lydian in a way Stork anticipated, and that Lydian became cash poor forcing it to sell additional shares that heavily diluted remaining shareholders, including Stork." (DE-1, ¶¶16, 18, 19, 30, 31, 40)  Finally, in Count III, Stork specifically alleges "that. . . Defendants owed all shareholders of Lydian, including Stork, a fiduciary duty to treat all shareholders equally and to ensure all shareholders benefit proportionately from their interest in Lydian." (DE-1, ¶55)  These claims are unequivocally derivative in nature.

Contrary to Stork's unsupported allegations in Counts II and III, the documentary evidence, deposition testimony, and the declarations filed simultaneously with this Motion

---

[2] Notably, this Court ruled in its Order on Defendants' Motion to Dismiss (DE -29) that Count-II for Fraud shall be treated as fraudulent inducement and, therefore, Defendants will not reargue the principles of the economic loss rule in this Motion.

(hereinafter, the "Evidence") establish beyond genuine dispute that Stork's claims are derivative in nature, that no statutory demand was made upon the board by Stork under Fla. Stat. §607.07401, that the Complaint is not verified, that each claim should have been brought as a shareholder derivative action rather than a direct claim by Stork, all of which are fatal to Counts II and III thereby rending Summary Judgment proper from the outset.[3]  The Evidence further confirms beyond genuine dispute that Stork cannot establish that the fraud and breach of fiduciary duty claims proximately caused the damages Stork seeks to recover.  See infra.

Finally, this Motion and the Evidence will show beyond genuine dispute that the board used their business judgment and made well-informed decisions identified in the Lydian minutes between December 2006 through September 2007 including, but not limited to:  (a) approving the Transaction; (b) providing bonuses to senior Lydian management who contributed substantial time and services developing LWM and making the Transaction possible; (c) repurchasing shares of certain LWM employees, clients and/or shareholders who became part of CNC as a result of the Transaction; and (d) approving the repurchase of certain other shareholders' shares of Lydian as it had done well before the 2007 Transaction.  The directors reasonably, in good faith and independently acted with due care in exercising their business judgment relative to the foregoing. The Board believed those decisions to be in the best interests of Lydian and its shareholders based upon information it received from Lydian's management, Lydian's general counsel, outside counsel, various LWM employees who participated in negotiating and closing the Transaction and Sandler O'Neil ("Sandler") and Cambridge Capital Partners ("Cambridge"), both high-profile investment banking firms.  Accordingly, Brown, Stanton, Clark and Purcell are

---

[3]  This court may enter Summary Judgment pursuant to the case law and argument establishing that Counts II and III are derivative without considering the additional arguments supporting Summary Judgment as to Counts II and III.

entitled to summary judgment on Count-III for Breach of Fiduciary Duty on the following grounds:

(1)    the directors acted with the due care as established in Fla. Stat. §607.0830 and their decisions are protected by the business judgment rule;

(2)    in all events, the directors are shielded from personal liability under Fla. Stat. §607.0830 because Stork cannot show that any of the Directors acted in conscious disregard of the best interest of the corporation or engaged in willful misconduct; and

(3)    Stork has no competent admissible evidence showing that his alleged damages were proximately caused by the directors' alleged breach of duty, and his speculative damage figures are insufficient as a matter of law.

## II.    **Standard for Motion for Summary Judgment**

In moving for summary judgment under Fed. R.Civ.P. 56, the Defendants may simply point out to the Court that there is an absence of support for Stork's case, or, alternatively, the directors may come forward with affirmative evidence demonstrating that the Plaintiff will be unable to prove his case at trial. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). In response, Stork must go beyond pleadings and present competent admissible evidence designating specific facts showing that there is a genuine issue for trial as to each and every element as to which he bears the burden of proof at trial. Id.; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Celotex Corp. v. Calrett, 477 U.S. 317, 321-24 (1986). Because the undisputed facts show that there are no genuine issues of material fact as to essential elements of Stork's claims for breach of contract, fraud in the inducement and breach of fiduciary duty, summary judgment should be granted on Counts I, II and III.

### III.    Statement of Undisputed Facts
#### Background

Lydian is a corporate holding entity that was involved in offering a full array of banking and management services to individuals and businesses, including banking and wealth management services. (Brown Affidavit, **Ex. "A."**)  Brown was an officer (CEO) and on the Board of Directors of Lydian (the " Lydian Board"). (Complaint, ¶¶ 6-9, Brown Affidavit, Ex. "A" and Directors' Curriculum Vitae, attached as **Composite Ex. "B."**)    Between 2001 and 2005, Stork also sat on the Lydian Board.  (Complaint, ¶13 and *infra*)  Stork currently owns 434,000 shares of Lydian stock.  (Id. at ¶14).

Lydian had no wealth management business prior to Jan. 2001 when it purchased Capital Management Strategies Financial Services, Inc. ("CMS") for approximately $5,000,000.  (Brown Affidavit, Ex. "A.")  Steve Lockshin ("Lockshin") started CMS in 1994, which was a consulting firm for wealthy individuals and, therefore, came to Lydian with Lydian's purchase of CMS. (Lockshin Depo., Ex. "B," p.15)  Lockshin was the President and Director of CMS. (Brown Affidavit, Ex. "A.")  CMS ultimately became LWM as a result of a name change.  Id.   In 2011, Barron's recently ranked Lockshin the No. 1 independent financial advisor in the nation's Top 100          Independent          Financial          Advisors.                    See http://www.globenewswire.com/newsroom/news.html?d=230986.   Lockshin served as the CEO of LWM from 2001 until the consummation of the Transaction in 2007.  (Brown Depo., **Ex."C,"** p.62.)

Lydian was the holding company for LWM, its subsidiary.  (Complaint, ¶¶ 6-9 & Brown Affidavit, Ex."A.").   In 2005, Lockshin expressed an interest in selling LWM.  (Lockshin Depo., **Ex."D,"** pp.15, 113-114)   In short, since Lockshin played the key role in maintaining LWM clients, the directors understood that ". . .if Lockshin want[ed] . . . to [sell LWM] then it should

be sold" or risk losing all of LWM and its client base without any benefit to Lydian.  (Id. at pp.
113-114, Brown Affidavit, Ex."A; " see also Depositions, Elizabeth Nesvold ("Nesvold"), **Ex.
"E,"** pp. 34-35, 43, & 99-100,   Johnson **Ex. "F,"** pp. 122-123, 196, 199-200 and Stanton **Ex.
"G,"** pp. 39-43, )   The value of a wealth management businesses actually in its senior
management and the assets under management. (Depo., Nesvold, Ex. "E," pp. 29-34)

### The Lydian Meeting Minutes and Unanimous Written Consents

The active process for the sale started in December 2005.  Throughout the following
months, the potential sale of LWM was the subject of several board meetings.  On Sept. 14,
2006, the Lydian Board met and discussed "at length":  (a) the possible sale of LWM; and (b) a
bonus pool to certain employees of LWM, Fortigent and senior Lydian management payable
upon the sale of LWM.  (Sept. 14, 2006 Minutes, **Ex."H."**)  After discussing the foregoing, the
Lydian Board "was concerned over the total amount of proposed compensation [and] requested
that [] Brown prepare for . . . further review a revised schedule detailing the recommended
compensation for the selected individuals." (Id.)

On Dec. 4, 2006, Lydian Board met and was advised by Lydian management of the
following: (a) the status of the sale of LWM; (b) the gain Lydian would realize assuming a sale
of $125 million; (c) the summary of payments to be made  to LWM employees and Fortigent as
part of a "retention pool;" (d) Lockshin's objectives, including his sales people having an equity
interest in the  CNC post-sale; (e) alternatives and comparisons to the sale of LWM; (f)  interest
expressed by CNC, National Financial Partners ("NFP"), and Lehman Brothers' in acquiring
LWM; (g) tax issues associated with alternatives to a sale of LWM; (h) Lydian retaining all its
interest in LWM and (i) Sandler's continued solicitation of outside bids for the purchase of
LWM. (Dec. 4, 2006 Minutes, **Ex."I"** & Calculation of Lydian Gain on sale of LWM attached).

On December 29, 2006, the Lydian Board met again and discussed, among other things: (a) the letter from CNC regarding its proposed terms for acquiring LWM (the "LOI") and CNC being the highest bidder; (b) the revised bids for the purchase of LWM; (c) the withdrawal of Wilmington Trust's bid to purchase LWM; (d) Mr. Daly's, of Sandler, contention that CNC's bid was in the upper quartile and was credible; (e) the timing for completing an agreement with CNC; (f) that fact that LWM would ". . .roll[] a large portion of the proceeds from the repurchase of their [Lydian] stock and [a] retention pool into equity ownership in the CNC entity formed to acquire LWM's assets;" (g) contingent liabilities to Lydian post Transaction; (h) compensation to LWM's management and whether CNC would require LWM's management to divest all its holdings in Lydian; (i) maintaining Lydian's Florida wealth management clientele and non-competition agreements with CNC in that regard; (j) the Lydian Board's recommendation to move forward with a response to CNC's offer; and (k) the appointment of Andrew Putterman ("Putterman"), William Reichert ("Reichert") and Christopher Boldman, Esq., ("Boldman") to negotiate the Transaction on behalf of Lydian. (Dec. 29, 2006 Minutes, **Comp. Ex."J"** & CNC's LOI to purchase LWM). The LOI stated the purchase price of $125.0 million for LWM represented a 14.0x multiple on projected 2006 normalized EBITA[4] and the need for LWM employee incentive programs to retain those who became affiliated with CNC as a result of the Transaction. Id.

On February 22, 2007, the Lydian Board met again and approved the Dec. 4 & 29, 2006 Minutes, and reviewed and ratified certain purchases and sales of Lydian common stock that had occurred since Sept. 14, 2006. (Feb. 22, 2007 Minutes, **Ex."K"**)

---

[4] "EBITA" is an acronym referring to a company's earnings before deduction of interest, tax and amortization expenses.

On March 24, 2007, the Lydian Compensation Committee of the Board of Directors, Johnson, Purcell and Stanton, met and approved and adopted resolutions related to the foregoing. (March 24, 2007 Unanimous Written Consent of Compensation Committee, **Ex."L"**) These resolutions include: (a) authorizing Lydian management to negotiate the terms of the Transaction with CNC; (b) settling in full, in cash, certain options, stock appreciate rights and restricted stock granted to LWM employees in connection with the Transaction; (c) the removal of restrictions and vesting of certain restricted stock granted to LWM employees; and (d) mandating that the foregoing was contingent upon the closing of the Transaction. Id.

In addition, on March 24, 2007, the Lydian Board met and resolved that: (a) the Board reviewed the Purchase and Sale Agreement regarding the Transaction; (b) the Transaction was in the best interest of Lydian and its stockholders; (c) the "Authorized Officers" had authority to sign and execute the Purchase and Sale Agreement on behalf of Lydian; (d) Lydian is authorized to make certain cash payments to certain employees of seller subsidiary (i.e., LWM) as determined by the Lydian Compensation Committee following the closing of the Transaction; (e) the "Authorized Officers" are granted authority to engage attorneys, investment bankers and other professional on behalf of Lydian in connection with the Transaction; and (f) to execute and deliver such other agreements in connection with the Transaction and the above resolutions, ". . .the approval thereof [which will] be conclusively evidenced by their execution. . . on behalf of [Lydian]. (March 24, 2007 Unanimous Written Consent of Lydian Board, **Ex."L-1"**) The above resolutions were ratified by the Lydian Board. Id.

On May 1, 2007, the Lydian Compensation Committee resolved: (a) that it was in the best interest of Lydian to reward certain senior executives for their efforts in developing LWM and contributing to the Transaction; (b) that Lydian establish a bonus compensation pool (the

"Bonus Pool") consisting of $2,500,000 in cash and 500,000 restricted common stock shares of Lydian for payment to senior executives and that certain restricted shares be distributed as part of the Bonus Pool as part of the Committee's bi-annual grant of equity compensation; and (c) that Johnson was authorized to approve the allocation of the cash awards and restricted shares authorized in the resolutions among the Lydian executives and in such amounts as Johnson determined, based upon the recommendation submitted to the Board.   (May 1, 2007 Minutes, **Ex."M;"** <u>see</u> <u>also</u> the charts attached to the minutes outlining the Cash and Restricted Stock Awards as presented to Johnson and approved)

On May 17, 2007, the Lydian Board met and approved the Feb. 22, 2007 minutes and further discussed: (a) the Transaction which closed on May 1, 2011; (b) the proposal for Lydian to repurchase certain Lydian shareholders' shares (which was done by presentation to the Board); (c) the proposal to complete the process of repurchasing shares held by Palisades' Partnerships which began in 2006,[5] including Brown's individual repurchase of 170,000 shares of Palisades shares and Lydian's repurchase of a like number of shares from the Brown Charitable Trust;[6] (d) the Board's decision that it was in Lydian's best interest to first repurchase shares from those investors first brought to Lydian through LWM or its predecessor, CMS; and (e) whether any other investors requested that their shares be repurchased and whether any outside shareholders had expressed an interest in acquiring those shares. (May 17, 2007 Minutes, **Ex."N"**)  Following discussion, and upon motion duly made, the Lydian Board approved the proposed share repurchase plan as presented.  (<u>Id</u>.; <u>see</u> <u>also</u> the Stock Repurchase Plan attached

---

[5] <u>See</u> the July 27, 2006 Unanimous Written Consent wherein the Lydian Board first approved the repurchase of Palisades shares in Lydian, which consent is quoted and attached *infra*.

[6] So, rather than Lydian purchasing the additional 170,000 shares from Palisades, Lydian would and did purchase 170,000 shares from the Brown Charitable Trust and Brown Purchased 170,000 from Palisades so that the net effect to Lydian and its shareholders was zero.

to the minutes and bates-labeled CARL00914.) As evidenced, Stork was not part of the repurchase plan. Id.; See Also *infra*.

On September 20, 2007, the Lydian Board met and approved the May 17, 2007 minutes and further reviewed the sales and repurchases of Lydian's stock since Feb. 22, 2007. (September 20, 2007 Minutes, **Ex."O"**) A list of the transactions was included in the records of the meeting and is attached and identified as CARL000915. Brown reviewed the transactions with the Lydian Board, noting that the majority of repurchases occurred with the LWM Transaction. Id.   As such, the Lydian Board ratified the transactions, and Stork was not identified as being part of the transactions for the Lydian Board to consider. Id.   Moreover, the asterisks after certain names  on CARL000915 were repurchases made in connection with taxes due on restricted stock for employees, which was the practice followed by Lydian since its inception. Id.; (see also Brown Affidavit, Ex. "A")

Finally, on Oct. 23, 2008, the Lydian Board met and reviewed the sales and repurchases of Lydian's stock since Sept. 2007. (Oct. 23, 2007 Minutes, **Ex."P"**)   The majority of transactions were related to the payment of taxes by recipients of restricted stock grants, which was part of Lydian's practice since its inception. Id. and (Brown Affidavit, Ex. "A.")

Based upon the foregoing, it is undisputed that the Lydian Board met regularly and approved the Transaction, approved bonuses to senior management, approved the repurchase of shares of certain LWM employees, clients and/or shareholders who became part of the Transaction, and approved the repurchase of certain other shareholders' Lydian shares. See *supra*.  Moreover, as evidenced by the Minutes and Unanimous Written Consents, the Lydian Board never knew of, considered, approved or ratified Stork's extraordinary Contract, and never gave Brown authority to bind Lydian to the Contract. Id.; see also Stanton and Johnson depos,

*infra.*    Moreover, the Lydian AOI and Bylaws do not confer express authority upon Brown to bind Lydian to Stork's extraordinary Contract.  (*See* AOI and Bylaws attached as **Comp. Ex. "Q,"** and specifically the Bylaws, **Ex. "Q-1**, *see also* Stuart R. Cohn "Cohn" Affidavit, **Ex. "R"** and CV, **Ex., "R-1"**),

As to Stork, he knew the Contract had to be approved by the Lydian Board and admits to such in his answers to each Johnson, Stanton and Purcell's interrogatories attached as (Exs. "S," "S-1," and "S-2," respectively:

> **Response to Interrogatory No. 6**: ". . . Subject to, and without waiving the foregoing [General Objections], Responding Party states that, he is informed and believes that Lydian's Board of Directors. . .had to approve Lydian's agreement with Stork to repurchase all of Stork's shares in Lydian for $17.50 per share. . . ." (Id.)

At his deposition, Stork further testified to the following:

> **Question:** Okay. Are you aware [the Lydian Board] never approved the purchase of -- or the repurchase of your shares. . . specifically your shares?
>
> **Answer**:  As I -- as I'm here today, I'm aware that my shares weren't even presented to the board. . . . They approved the aggregate plan.
>
> **Question**: As of 2008, when you received the information that you had requested from. . .Lydian. . . , would it be a correct statement you were then aware that your proposed sale of your shares had never been presented to the board of directors and therefore, obviously, it couldn't have been approved, true?
>
> **Answer**: At some point during 2008. . .as I investigated the 2,000-plus pages of documents that I received [from Lydian], I discovered that mine had not been part of that plan.
>
> ***
>
> **Question**: And therefore, it couldn't -- if it hadn't been presented, it obviously couldn't have been approved by the board, true?
>
> **Answer:** If it hadn't been presented, it couldn't have been approved by the board? I guess that's true.
>
> ***
>
> **Question**: Well, do you recall that proposal; that is, that the stock repurchase plan as it related to [LWM] employees and [LWM] clients' customers, that their shares in large part were being repurchased and that the board approved that transaction?

**Answer:**   Yeah, the board approved that transaction on May 17th, [2007]?

***

**Question:**   [I]n terms of the documents that you've reviewed with regard to the retention of the [Sandler] to be the investment bankers, do you have any dispute with the board having approved [Sandler] to hire or to retain them to be the investment bankers on this transaction?

**Answer:**   [Sandler] is a reputable – reputable banker . . . .

***

**Question:**   [] If I understand your testimony, [] neither Purcell, Johnson nor Stanton, based on the information you have, played favorites in terms of who got their shares repurchased; is that correct?

**Answer:**   I'm saying they endorsed and approved a plan that was full of favoritism.

**Question**: And that plan was one that was presented by management to them?

**Answer:**   Right, who they have a duty to oversee. So they approved a plan that was not fair, and they played favorites.

***

(Stork Depo., **Comp. Ex. "T,"** pp. 212-214, 240-243, 317-318); filed , in full, under seal pursuant to court order.

Significantly, Stork never contacted Stanton, Purcell or Johnson to discuss the Transaction or his alleged claims, and admits he is unaware if they even knew about the contract (Id.). The Lydian Board was unaware of any alleged agreement or contract for Lydian to purchase Stork's shares in Lydian. (Id.; Stanton Depo., Ex. "G," pp.194-197 & Purcell Depo., **Ex. "U,"** pp.155-156, 205, 206.)

Interestingly, while on the Lydian Board, Stork voted to approve stock repurchases and, therefore, knew that same required Lydian Board approval and that, in those instances, the Lydian Board voted only to grant Brown authority to enter into those specific transactions. (See Lydian Minutes, July 16, 2002, August 15, 2002 (see specifically ¶¶ 6 &7 pp.1 & 2)), February 28, 2003 & Sept. 14, 2004. (Lydian Minutes, **Comp. Ex. "V."** Likewise, the Lydian Board routinely discussed and approved other share repurchases as it deemed in the best interest of

Lydian. (See Lydian Unanimous Written Consents dated March 24, 2005 (allowing for a specific authorized repurchase amount of $3 Million), Minutes dated September 9, 2005 (noting Lydian had nearly exhausted the $3 Million in share repurchases authorized by the Board and increasing that amount by $1 Million) and the July 27, 2006 Unanimous Written Consent (wherein the Lydian Board first approved the repurchase of Palisades shares in Lydian) (See Minutes and Unanimous Written Consents, **Comp. Ex. "W."**)

Next, it is also undisputed that Stork knew he had the option to file a derivative lawsuit. (Stork Depo., Ex., "T," pp. 216-17, 299-301)  However, no statutory demand was made on the Lydian Board by Stork under Fla. Stat. §607.07401, and the Complaint is not verified attesting to compliance with Fla. Stat. §607.07401 (Brown Affidavit, Ex. "A"; see also DE-I).   In addition to the allegations in his Complaint, which are specifically quoted *infra* and incorporated herein by reference, Stork repeatedly pleads and testifies that all shareholders should have been treated equally and proportionally in connection with the Transaction.  (Stork Depo., Ex. "T", pp. 197-98, 200-201).

As to Stanton, Purcell and Johnson, Stork testified: (1) that he is not aware of any personal benefits received by them as result of the Transaction; (2) that they did not "play favorites" or select the individuals whose shares were repurchased; (3) that he has no evidence of malicious intent; and the directors did not have any conflicts of interest.  (Id., 325, 327-335)

Next, according to Johnson, any share repurchases made by Brown had to be approved by the Board or were approved by the board in advance by authorizing Brown to make repurchases within specific monetary ranges.  (Johnson Depo., Ex. "F," pp. 67, 68, 70, 73,  74, 167, 168, 207-208; see also Boldman Depo., **Ex**. "X", pp. 83-84).  Johnson stated, unequivocally, that Brown did not have any authority to purchase ANY shares without Board approval, and that "in order

for [Stork's] shares to be purchased by [Lydian, board approval was required]." (Id., pp. 207-208, 269-270; see also Boldman Depo., Ex. "X", p. 271-277). Boldman confirms any agreement with Stork was "Never" approved. (Boldman Depo., Ex. "X", p. 273). As to the Transaction, Johnson testified it was in the best judgment of the board to approve the bonuses to management associated therewith, and Stanton testified that Sandler, the Skadden Arps law firm and Lydian management kept it up-to-date with regard to the Transaction. (Id., 235-238; see also Stanton Depo, Ex. "G" pp. 117-122, 227, 242-246 and Boldman Depo., Ex. "X", wherein he states the board used its "best business judgment," pp. 264 & 274).) Stanton testified that the board approved using the net proceeds from the Transaction to repurchase certain Lydian shares and it was the right thing to do. (Id., p.178)

Finally, Elizabeth Nesvold testified that the Transaction ". . .tends to still be recorded as one of the highest prices paid for a wealth management firm. (Nesvold Depo, Ex. "E" pp. 60-65, specifically *quoting* p. 63) Ms. Nesvold also meet with the Lydian Board, conducted presentations regarding the Transaction and discussed same with Lydian Management. (Id., pp. 56-58, 65-66.)

## IV.   Argument and Authorities Supporting Summary Judgment-Count I (Breach of Contract)

In Count I, Stork attempts to assert a cause of action for breach of contract against Lydian for its alleged failure to repurchase 434,000 of Stork's Lydian shares at $17.50 per share. (DE-1) However, the undisputed evidence shows that Contract is void. See *infra*.

In Cox Enterprises, Inc. v. News Journal Corporation, 2008 WL 5142417 (M.D. Fla.), the CEO of News Journal Corporation ("NJR") presented "golden parachute" agreements to senior NJR officers allowing, among other things, those officers to receive significant severance packages six (6) times the amount of their salary in the event of termination or material adverse

change in NJR.  Id. at *2-3.  The court, in determining whether to set aside the agreements, found that ". . . there never was a NJC Board of Directors meeting during which the golden parachute agreements were [ever] discussed." Id. at *4.  In fact, the CEO, who had since passed away, had never presented the agreements to the board and thus same were never ". . . disclosed to or approved by the NJC Board of Directors." Id.   The court learned through testimony that the CEO had "privately and unilaterally" offered the agreement to the two officers without the boards' knowledge. Id. at *5.

Cox Enterprises, Inc. ("Cox") contended that the golden parachute agreements were void because they were entered into without corporate authority and without ratification by the NJR Board.  Id. at *6.   "Corporate officers have actual authority as granted by the corporate bylaws to act in the ordinary day-to-day operations of the business.  Id.; see also Fla. Stat. §607.0841. To the extent duties are not set forth in the bylaws, the board of directors may authorize officers to take specific action in the best interest of the corporation.  Id. "Generally, the president or [CEO] does not have the power to enter into extraordinary contracts absent authorization set forth in the. . .bylaws or granted by the board of directors."  Id. at *7; (omitted citations). However, "[a]n extraordinary contract entered into by a corporate president may later be ratified by the. . .board of directors."  Id.; see also Forest Indus., Inc. v. Sharfstein, 482 F. 2d 915, 925 (7th Cir. 1972).  The golden parachute agreements were extraordinary agreements due to the benefits conferred on the officers and the lack of benefit to NJR, the corporation. See Cox Enterprises, 2008 WL at *7.  The court found that the bylaws did not confer express authority on the CEO to enter into the agreements.  Id. at *8  Likewise, the court ruled that even though the CEO had made employment decisions in the past without board objection, the golden parachute agreements were kept secret and, therefore, the CEO could not have any implied authority to

bind NJC. Id. Moreover, board members cannot be found to have ratified agreements they did not know about and did not have reasons to suspect existed. Id. at *9 As such, the agreements represent an extraordinary transaction outside the authority granted to the CEO. Id. Based upon the foregoing, the court found the agreements void. Id.

Here, the overwhelming evidence establishes that the Lydian AOI and the Bylaws do not grant Brown express authority to bind Lydian to extraordinary transactions as reflected in the Contract. (See supra, Johnson Depo., Ex. "F,"pp. 207-208, 269-270, Boldman Depo., Ex. "X", pp. 271-277). Moreover, Brown did not have implied authority to enter into the Contract as evidenced by Johnson and Stanton's deposition testimony. See supra.[7] See also Cohn Affidavit, Ex. "R." Even so, Stork undeniably knew the Contract required Board approval and, thus, Stork had actual knowledge of Brown's limitations on binding Lydian to the Contract without Board approval. Stork's Depo., supra. Additionally, not only did Brown not execute the Contract, but the Lydian Board never approved nor ratified the Contract as it was never disclosed to them. (See DE-1-3, Stork Depo., Stanton Depo., and Johnson depo supra & Purcell Depo., Ex. "U," pp. 155-156, 205-206 & Lydian Meeting Minutes, Lydian Unanimous Written Consents) The Lydian Board never even heard of Stork's Contract until this litigation was filed. (Id.; see also Stanton Depo., pp. 194-198, Ex. G.") Significantly, even Stork admits in his deposition testimony and responses to four separate interrogatories that the Lydian Board had to approve the

---

[7] "Apparent authority is not actual authority, whereas implied authority, on the other hand, is actual authority circumstantially proved." 2 Fletcher Cyc. Corp.§449. One cannot, like Stork, ". . .rely upon a corporate agent's apparent authority when one knows that the agent does not have actual authority. Id.; see also Stork's deposition testimony and answers to interrogatories below wherein he admits having knowledge that the Lydian Board had to approve the Contact and did not so, which clearly establishes that Stork knew Brown did not have any authority to bind the corporation without board approval. 2 Fletcher Cyc. Corp.§449, fn 34, citing, College of Virgin Islands v. Vitex Corp., 283 F.Supp. 379, 382-383 (D.C. Virgin Islands1966)(actual knowledge of corporate agent's limitations is binding upon third person and defeats any right of latter to rely on the ostensible authority of the officer or agent to bind the corporation), aff'd 393 F.2d 381. Finally, "[d]espite the agent's representations, where one deals exclusively with an agent in an extraordinary transaction, one has a responsibility to ascertain the agent's authority." 2 Fletcher Cyc. Corp.§449

Contract and that same was not approved.  (See Stork Depo. and Stork's responses to interrogatories, *supra*.)  At best, assuming Stork's argument to be true, he can only contend that Brown privately and unilaterally offered him the Contract without the Lydian Boards' knowledge.  Even so, this does make an otherwise void Contract enforceable when same lacks Board approval. See Cox Enterprises, 2008 WL at *9.

Simply put, the Contract is void because it was entered into without corporate authority and without ratification by the Lydian Board. Id. at *6-7; see also Forest Indus., 482 F.2d at 925 and Cohn Affidavit., Ex. "R."  This extraordinary Contract falls well outside any authority Brown had to act in the ordinary day-to-day operations of the Lydian.  Id.; see also Fla. Stat. §607.0841 and Cohn Affidavit., Ex. "R." The Contract is extraordinary due to the benefits conferred on Stork and the lack of benefit to Lydian. Cox Enterprises, 2008 WL at *7 and Cohn Affidavit., Ex. "R."  Brown did execute share repurchase agreements in the past; however, that action was based upon specific Lydian board resolution or specific ratification granting him such authority to act on behalf of Lydian.  See Lydian Meeting Minutes and Unanimous Written Consents, *supra*.  Because Brown had no express or implied authority to bind Lydian, because Stork admits the Board had to approve the Contract, because the board never passed a resolution granting Brown any authority to enter into the Contract; because the bylaws do not grant such authority; because the Board never ratified the Contract or even knew of its existence, and because Lydian did not stand to benefit from the Contract, the Contract represents an extraordinary transaction outside the authority granted to Brown and is therefore void.  Cox Enterprises, 2008 WL at *9 and Cohn Affidavit., Ex. "R."    Accordingly, Lydian is entitled to summary judgment.

### V.    Argument and Authorities Supporting Summary Judgment -  Count II (Fraud) & Count III (Breach of Fiduciary Duty) as Same are Derivative Claims

In Count II, Stork attempts to assert a cause of action for fraudulent inducement against Brown and Lydian arising solely from actions allegedly directed at and harming Lydian and its shareholders.   In Count III, Stork alleges breach of fiduciary duty claims against Brown, Johnson, Purcell and Stanton arising solely from their duties as directors of Lydian.   Both these counts fail because the Complaint's allegations incorporated into and contained in each count demonstrate the derivative nature of the alleged claims subject to the requirements of Fla. Stat. §607.07401, Florida Statutes.[8] In other words, Counts II and III are not cognizable as direct and individual causes of action and, for the reasons outlined with particularity below, Stork lacks standing to proceed as a matter of law.   Cohn Affidavit., Ex. "R."

(i)     **Plaintiff's Fraudulent Inducement and Breach of Fiduciary Duty Allegations, on Their Face, Demonstrate The Derivative Nature of Those Claims**

Shareholder derivative actions seek redress for an injury suffered by the corporation.  See Fort Pierce Corp. v. Ivey, 671 So. 2d 206, 207 (Fla. 4th DCA 1996).   Where the injury is primarily against the corporation or the stockholders generally, the action is derivative.   See Lewis v. Seneff, 654 F. Supp. 2d 1349, 1361-1362 (M.D. Fla. 2009) (noting that under Florida's "separate and distinct injury test, the injury must be sustained directly by the stockholder and the injury must be separate and distinct from any injury sustained by other stockholders")(emphasis supplied)(citing Alario v. Miller, 354 So. 2d 925, 926 (Fla. 2d DCA 1978)).

Importantly, on a summary judgment, the court must "look to the body of the complaint to determine whether the injury is direct to the shareholder or to the corporation."   Karten v.

---

[8] Florida's shareholder derivative suit statute applies in federal court because the power to terminate a derivative action depends on the law of the incorporating and forum states.  See Klein v. FPL Group, Inc., 2004 WL 302292, *15 (S.D. Fla. 2004) (citing Burks v. Lasker, 44 U.S. 471 (1970)); see also Jacobs v. Adams, 601 F.2d 176, 179 (5th Cir.1979) ("We ... look to Florida law, since Florida is both the forum state and the state of ... incorporation, to determine whether a demand on shareholders, or an alleged excuse for not so demanding, is a necessary prerequisite to bringing a derivative action in Florida's state or federal courts.).   Here, there is no dispute that Lydian is incorporated in Florida, and Florida is the forum state.

Woltin, 23 So. 3d 839, 841 (Fla. 4th DCA 2009); see also Alario, 354 So. 2d at 926.  Where, as here, the complaint's fraudulent inducement and breach of fiduciary duty allegations, as well as the competent evidence of record, establish conclusively that Stork's alleged injury is not separate and distinct from injury sustained by other Lydian stockholders, judgment should be entered in favor of Defendants on Counts II and III. See, e.g., AmSouth Bank v. Wynne, 772 So.2d 574 (Fla. 1st DCA 2000)(shareholders did not have a cause of action against bank for fraud and breach of fiduciary duty that was separate from derivative action on behalf of corporation); Paul And Suzie Schutt Irrevocable Family Trust v. NAC Holding, Inc., 283 Ga.App. 834 (Ga. App. Ct. 2007)(Action brought by minority shareholders of subsidiary against subsidiary, alleging claims including fraud, fraudulent inducement, and conversion, was derivative action, rather than a direct action in that each count of complaint alleged that subsidiary's officers breached their fiduciary duties to subsidiary, and minority shareholders did not distinguish their injuries from those suffered by all shareholders of subsidiary); In re WorldCom, Inc., 323 B.R. 844 (S.D.N.Y. 2005)(allegations in shareholder's complaint regarding misrepresentations that allegedly caused shareholders to continue holding onto their stock and prevented them from making informed decision on whether to sell stock before it diminished in value, stated claim for diminution in value of shares which belonged to corporation); In re Sunrise Securities Litigation, 916 F.2d 874 (3rd Cir. 1990)(After reviewing the body of the complaint, the court did not agree with plaintiffs' characterization of the allegations being that of direct injury from fraud, distinct from the injury sustained by the company and all other depositors as a result of defendants' mismanagement; see also Cohn Affidavit., Ex. "R.")

Likewise, actions against a corporate officer or director for breach of fiduciary duty have been held to be derivative actions, where shareholders have not suffered any injury separate and

distinct from that suffered by the corporation as a whole.  See Karten; Orlinsky v. Patraka, 971 So. 2d 796, 801-802 (Fla. 3d DCA 2007) (noting that shareholder claims for breach of fiduciary duty must be filed as derivative claims); Braun v. Buyers Choice Mortgage Corp., 851 So. 2d 199, 203 (Fla. 4th DCA 2003) (holding that claim of breach of fiduciary duty should have been brought as shareholder derivative claim rather than direct claim by individual shareholder because all shareholders would have been equally harmed); Hill v. Brady, 737 So. 2d 1243, 1244 (Fla. 5th DCA 1999) (claim for breach of fiduciary duty was derivative because minority shareholder's harm was primarily caused by injury to corporation); see also Lewis, 654 F. Supp. 2d at 1364 (claim for breach of fiduciary duty was derivative under Florida law); Hodges v. Buzzeo, 193 F. Supp. 2d 1279, 1288 (M.D. Fla. 2002) (claim for breach of fiduciary duty had to be brought as derivative claim because the harm only indirectly affected shareholder's stock); & Kloha v. Duda, 246 F. Supp.2d. 1237, 1243 (M.D. Fla. 2003) (shareholder failed to show direct injury when alleging diminution in value of stock suffered by all other shareholders).

The general allegations incorporated into Counts II and III of Plaintiff's Complaint as well as those contained within each count make clear that both causes of action are derivative in nature[9] in that they involve alleged harms to Lydian and its shareholders, not Stork directly, as Lydian and its shareholders were, according to Stork's own allegations, equally harmed.  More specifically, Stork alleges (with all emphasis supplied):

a.  ". . . [T]he main wealth Lydian has reliably enhanced is that of its management, at the expense of its shareholder[s] and clients [and] Lydian's management team paid itself generous salaries and benefits, and substantial compensation in the form of Stock while leaving its clients and shareholders to suffer the consequences." (DE-1, ¶12); see also (DE-1, ¶27)

---

[9] Defendants also seek summary judgment as to the breach of fiduciary duty count based upon the business judgment rule.  See infra. However, the merits of that argument need not be reached if this court agrees, as it should, that Count III is derivative.

b.   "The [T]ransaction sold this business for an inadequate price on terms that provided management insiders with a windfall <u>at the expense of the company and its shareholders</u>." (DE-1, ¶16)

c.   "Stork raised his concerns with Lydian management, including Defendant Brown.  To silence Stork's concerns. . .Brown represented and agreed that Lydian would repurchase his shares. . . . stork accepted this offer, and because he believed he wou<u>ld have no</u> further interest in Lydian, he made no attempt to assert his rights as a shareholder to protect his interests  against what he suspected were ill-advised actions by Lydian's management that were <u>detrimental to Lydian's interest</u>."  (DE-1, ¶17)

d.   The directors, ". . .in breach of their fiduciary duty to treat <u>all shareholders</u> equally and proportionately, [] caused Lydian to repurchase the shares of certain favored shareholders. . . ." (DE-1, ¶18)

e.   "As a result of the cash paid to current and former executives, Lydian became inadequately capitalized. It was forced to obtain additional capital on terms that severely diluted <u>the remaining shareholders</u> []."  (DE-1, ¶19)

f.   "[] Defendants Clark, Johnson, Purcell and Stanton all voted to approve this transaction in their capacity as directors of Lydian, but took no action to ensure that <u>other shareholders</u>, such as Stork, who also desired to sell their shares to Lydian on the same terms and conditions, would have the opportunity to do so." (DE-1, ¶39)

g.   "The [CNB] transaction, together with the subsequent payments of cash to insiders, damaged Lydian in the way Stork had anticipated.  Lydian became cash poor, and was forced to sell additional shares at terms that heavily diluted <u>the remaining shareholders</u>, including Stork. Thus, Stork's shares of Lydian stock are now worth millions of dollars less. . . ." (DE-1, ¶40)

h.   ". . .If Stork had known that Brown did not intend for Lydian to keep its promise, Stork would have exercised his rights as a shareholder in Lydian <u>to protect Lydian from adverse consequences</u> of the [T]ransaction. . . ."  (DE-1, ¶52)

i.   "Stork's "shares of Lydian stock are worth less now than they would have been if he had taken steps <u>to protect Lydian</u> from the adverse consequences of the proposed the [T]ransaction. . . ." (DE-1, ¶53)

j.   "The individual defendants owed <u>all shareholders</u> of Lydian, including Stork, a fiduciary duty to treat all shareholders equally and to ensure that all shareholders benefit proportionality from their interest in Lydian." (DE-1, ¶55)

k.   "The individual defendants breached their fiduciary duties to Stork by <u>causing Lydian</u> to repurchase the Stock of favored Shareholders, including insiders, while failing and

refusing to cause Lydian to repurchase Stork's shares. . .under the same terms and conditions" (DE-1, ¶56)

These allegations undeniably establish that the alleged director breaches could only cause pecuniary damage to Lydian and all shareholders, and any damage to Stork is derivative of the harm to the corporation. (Cohn Affidavit., Ex. "R.")  Therefore, by his own admission, Stork is *not* alleging the required separate and distinct injuries necessary to bring a direct action as an individual shareholder.   Rather, these are *indirect losses* that must be pursued strictly as derivative claims.  See Hill v. Brady, 737 So.2d at 1244 (minority shareholder's claims that majority shareholder's actions adversely affected company's business, causing minority shareholder's stock to become worthless, are derivative claims); see also Braun v. Buyer's Choice, 851 So.2d at 203 (holding that a shareholder's lost value of his investment is an indirect injury that is not separate and distinct from that suffered by other shareholders)( Cohn Affidavit., Ex. "R.")  Additionally, to the extent Stork's allegations attempt to allege misappropriation of corporate funds and corporate waste, such claims against a corporate officer, director, or majority shareholder are owned by the company and may be brought by shareholders only as derivative actions.  See Orlinsky, 971 So. 2d at 801-02 (holding claims of corporate waste by a majority shareholder must be brought in a derivative action); Alario, 354 So. 2d at 926-27 (holding claim of misappropriation of corporate funds may only be remedied through a derivative action).

Finally, Stork's claims in Counts II and III that he would have asserted his rights derivatively as a shareholder prior to the Transaction but for the acts of the board is not meritorious because Stork could have brought a derivative action four (4) years after the May 17, 2007 closing or four (4) years after his alleged Contract was to be performed.  See Fla. Stat. 95.11(3).  (Cohn Affidavit., Ex. "R.")  The Statute of Limitations has since run and a belated attempt to now bring derivative claims would be futile.

Accordingly, Stork fails to demonstrate separate and distinct injuries necessary to bring a direct action as an individual shareholder and thus lacks standing to pursue these claims directly. As such, Summary Judgment must be entered on Counts II and III because each is derivative.

**(ii)    Summary Judgment Must be Entered on Counts II And III as They Contain Misjoined Derivative and Individual Claims**

Parties are not permitted to bring actions in more than one capacity, even if the causes of action arise out of the same occurrence.  See Dept. of Ins. of State of Florida v. Coopers & Lybrand, 570 So. 2d 369, 370 (Fla. 3d DCA 1990) (*citations omitted*).  Florida Rule of Civil Procedure Rule 1.110(g) "forbids the joinder of causes which arise out of separate rights." Id. at 371.  Under this principle, shareholders are not permitted to join direct and derivative claims in the same action.  See Karnegis v. Lazzo, 243 So. 2d 642, 643 (Fla. 3d DCA 1971) (reversing order which denied motion to dismiss for misjoinder of direct and derivative claims; noting that trial court should have granted motion to dismiss with leave for plaintiff to file separate derivative and direct causes of action); see also Haas v. Roe, 696 So. 2d 1254, 1255 (Fla. 2d DCA 1997).  Where causes of action are improperly joined, the court must direct the party to elect the action it wishes to pursue and dismiss the improperly joined action without prejudice to the party to commence separate causes of action on the dismissed claims.  See Dept. of Ins., 570 So. 2d at 371; see also Karnegis, 243 So. 2d at 643.

Where a cause of action for breach of fiduciary duty, properly belonging to a corporation, has been brought erroneously as a direct action by a shareholder, the court should dismiss the action without prejudice to the shareholder to refile the claim in a derivative action.  See Alario, 671 So. 2d at 927 (reversing entry of judgment without prejudice for parties to commence derivative action where action for breach of fiduciary duty was erroneously brought as direct shareholder action); see also Hodges, 193 F. Supp. 2d at 1289 (granting motion to dismiss

counterclaim for breach of fiduciary duty brought as direct action because minority shareholder failed to allege direct injury separate and distinct from that suffered by corporation).

Because Counts II and III include derivative claims that have been improperly joined with purported direct claims, this Court must grant summary judgment in favor of Defendants, and dismiss same.

### (iii)    Summary Judgment Must be Entered on Counts II and III Because Stork Failed to Comply with the Statutory Requirements for Derivative Actions

Even if Counts II and III had been filed in a separate derivative action, the action would still have to be dismissed for failure to comply with the requisite statutory requirements. Fla. Stat. §607.07401 (regulating derivative actions for corporations), requires that "[a] complaint brought in the right of a corporation must be verified and allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored. . . ." A pre-suit demand must be made to the board of directors prior to initiating a shareholder derivative action.  Cf. Dutch v. Gordon, 481 So. 2d 1235, 1235 (Fla. 3d DCA 1985). (Cohn Affidavit., **Ex.** "__.")

Stork has failed to meet the statutory requirements in the following respects: (1) the Complaint is not verified; and (2) the Complaint fails to allege that Plaintiff filed any pre-suit demand, and that the demand was refused or ignored by the board of directors.  This is because no such demand was ever made by Stork.  (Brown Affidavit, Ex. "R" & Cohn Affidavit., Ex. "R." ) As a result, Defendants are entitled to judgment as a matter of law on Counts II and III.

### VI.    Argument and Authorities Supporting Summary Judgment-Count III (Breach of Fiduciary Duty) Pursuant to the Business Judgment Rule

Even assuming *arguendo* that the allegations in Count III are not derivative in nature, which they are, Count III still fails as a matter of law because there is no basis in corporate law

to support a finding of breach of fiduciary duty by the individual Defendants.  (Cohn Affidavit., Ex. "R.")   In Count-III, Stork alleges the individual defendant directors "owed all shareholders of Lydian, including Stork, a fiduciary duty to treat all shareholders equally and to ensure that all shareholders benefit proportionately from their interest in Lydian." (DE-1, ¶55).  Stork claims that the defendants "breached that duty to Stork by causing Lydian to repurchase the stock of favored shareholders, including insiders, while failing and refusing to cause Lydian to repurchase Stork's shares of Lydian stock under the same terms and conditions." (Id., ¶55).  For the reasons outlined with particularity below, these allegations are unsupported by applicable law and judgment should therefore be entered in Defendants' favor.

The applicable standard of care set forth in Fla. Stat. §607.0830 requires that officers and directors act in good faith, with the care of an ordinarily prudent person in a like position, and in a manner reasonably believed to be in the best interest of the corporation.   Fla. Stat. §607.0830(1)(a)-(c).  The exercise of due care requires directors to inform themselves prior to making business decisions of information that is reasonably available to them. See Official Comm. Of Unsecured Creditors v. Liberty Sav. Bank, FSB (In re Toy King Distribs., Inc.), 256 B.R. 1 (Bankr. M.D. Fla. 2000).

Importantly, "[u]nder the business judgment rule directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion." Cottle v. Storer Communications, Inc., 849 F.2d 570, 574 (11th Cir. 1988) (citations omitted); In re Southeast Banking Corp., 827 F.Supp. 742 (S.D. Fla. 1993).  Nothing in this analysis is changed by the fact that errors or mistakes in judgment by the directors may have resulted in a loss to the company. FDIC v. Stahl, No. 91-7122-CIV-FERGUSON, 1994 Dist. LEXIS 7999 at *18. (S.D. Fla. May 18, 1994), aff'd

*in part and rev'd in part*, 89 F.3d 1510 (11th Cir. 1996).

Notably, the underlying premise of the business judgment rule is that the discretion to manage Lydian is vested in the board of directors, <u>not</u> its shareholders.  The business judgment rule mandates that the Lydian Board's decisions not be second-guessed based on the luxury of hindsight.  If the presumption is not overcome, "[t]hen the business judgment rule prohibits the court from going further and examining the merits of the underlying business decision and prevent[s] a fact finder, in hindsight, from second-guessing the decisions of directors." <u>Stahl</u>, 89 F.3d at 1517.  Where "the board acts with due care, good faith, and in the honest belief that they are acting in the best interests of the stockholders,... the Court gives great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute [its] views for those for the board if the latter's decision can be attributed to any rational business purpose." <u>Paramount Communications Inc. v. QVC Network Inc.,</u> 637 A.2d 34, 46 (Del. 1994). (<u>See</u> Meeting Minutes and Unanimous Written Consents attached, *supra*)

Moreover, "[i]t is well established. . .that stock holders need not always be treated equally for all purposes." <u>Nixon v. Blackwell</u>, 626 A.2d 1366, 1366-67 (Del. 1993); <u>see also</u> <u>Unocal Corp. v. Mesa Petroleum Co.</u>, 493 A.2d 946, 957 (Del. 1985)(discriminatory exchange offer held valid); <u>Cheff v. Mathes</u>, 199 A.2d 548, 554-6 (Del. 1964)(selective stock repurchase held valid); <u>Strassburger v. Earley</u>, 752 A.2d 557, 572 (De. Ct. Chancery 2000) (noting that "a corporation may ... lawfully repurchase shares of particular stockholders selectively, without being required to offer to repurchase the shares of all stockholders generally.  The exercise of this power is constrained only by the board's fiduciary duties."); <u>Delahoussaye v. Newhard</u>, 785 S.W.2d 609 (E.D. Mo. 1990).

Stripped to its core, Count III relies on Stork's claim that Lydian was obligated to repurchase his shares since it purchased shares from other shareholders following the Transaction. (Cohn Affidavit, Ex. "R.") As the aforementioned cases establish, however, that proposition has no basis in law where, as here, the undisputed evidence shows the Lydian Board, including the individual Defendants, made continuous, informed and conscious decisions aimed at making sure the Transaction and the share repurchases were in the best interest of Lydian. (Stanton, Depo. Ex. "G," pp. 90-91,103-104, 115-116, 122, 132-135, 157-160, 165-168, 170-171, 177, 194-198, 209-211, 235-240, 242-245, Purcell Depo. Ex. "U," pp. 202-204, 209, & Johnson Depo. Ex. "F," pp. 107, 135-136, 153,156-157,

In addition, Stork cannot point to any record evidence showing that the Lydian Board gained personally from the Transaction or any post decisions complained of by Stork. The directors' decision-making process was sound and they acted with due care, and there are no allegations that the board members did not act "independently" or with personal "interest." While Stork will argue that Brown benefitted from the Transaction thorough his receipt of bonuses and the Lydian's purchase of the Brown Charitable Trusts' shares in Lydian, the Evidence shows the Board approved this transaction as well.  (Meeting Minutes and Unanimous Written Consents, *supra*, & Johnson Depo., Ex. "F," pp.76-80, 140-142, 144-145, Stanton Depo., Ex. "G," pp. 53-54, 143-146, 151, 153-156, 237 & Purcell Depo., Ex. "U," pp. 109-113, 130-131). Moreover, the record Evidence shows that Brown utilized the proceeds from the purchase of the Trust's shares to purchase the shares of Palisades, rendering that transaction a "wash." (Id.; see also Meeting Minutes, Unanimous Written Consents and Brown Affidavit, Ex. "A"). Further, the Outside Directors specifically voted on, approved and/or ratified those transactions as evidenced.   Id.   Notably, Stork cannot point to any Evidence showing that the Outside

Directors received any financial benefit as a result of the Transaction or any post Transaction decisions by the board.  Therefore, any argument by Stork that Brown and the Outside Directors were on both sides of the Transaction would be baseless.

Significantly, Stork cannot identify any fraud, bad faith or abuse of discretion on the part of the board, or that any of their actions were "material" to them or that they were "interested" and, moreover, had not spoke to the directors about the Transaction or his claims. [10]  (See Stork Depo., Ex. "T," pp. 182-184, 285-290, 293-296, 324-326, 328-329 ("I'm not aware of them receiving any specific benefit"), 330-335 & Cohn Affidavit, Ex. "R,")).

In sum, Stork cannot point to any evidence showing that the directors' decision-making process was in any way deficient.  Instead, the Evidence firmly establishes that the directors' business decisions concerning the Transaction and repurchases of shares were made in good faith after the board was fully informed by management, general counsel, outside counsel and consultants involved in investment banking, and only after the board deliberated about the issues.  See id.; see also Stanton Depo, **Ex**. "G", pp. 117-122, 218-220, 227, 242-246). This evidence is sufficient evidence to support the entry of summary judgment in favor of Defendants as to Count III.  See, e.g., Treadway Cos. v. Care Corp., 638 F.2d 357, 384 (2d Cir. 1980) (affirming summary judgment for directors who engaged outside consultants, remained informed and

---

[10] Like many other states, Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines. Connolly v. Agostino's Ristorante, Inc., 775 S. 2d 387, 388 n. 1 (Fla. 2d DCA 2000). See Khanna v. McMinn, No. Civ.A. 20545–NC, 2006 WL 1388744 (Del.Ch.2006), at *17 (conclusory allegations as to director's business relationships are not sufficient to demonstrate that the director's "independent discretion would be compromised"); see also, id. at *20 ("the sweeping absence of particularity, here, precludes a reasonable inference that [a director's'] business dealings or relationships compromised his presumed independence."); see also In re CompuCom Systems, Inc. Stockholders Litig., 2005 WL 2481325, *8 (Del. Ch. Sept. 29, 2005) (reported at 31 Del. J. Corp. L. 687) ("The complaint simply does not allege that [the alleged] benefits were material to the directors."); see also California Public Employees' Retirement System v. Coulter, 2002 WL 31888343, *8 (Del. Ch. Dec. 18, 2002) (reported at 28 Del. J. Corp. L. 721) ("Mere approval of, or acquiescence in, a challenged decision of the board, without more, is insufficient to raise a reasonable doubt as to a director's independence or disinterest."). Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 175 (Del. Ch. 2005) ("[T]he fact that directors receive fees for their services does not establish an entrenchment motive on their part.").

deliberated on information available to them.)

### VII.   Argument and Authorities Supporting Summary Judgment as to Count II for Fraudulent Inducement for Failure to Establish Proximate Causation

In his fraudulent inducement claim, Stork alleges that ". . . had known that Brown did not intend for Lydian to keep its promise [to repurchase only Stork's shares], Stork would have exercised his rights as a shareholder to protect Lydian from the adverse consequences of the [T]ransaction. . . ." (DE-1, ¶52 – see also ¶¶17 and 53). However, in order to prove fraudulent inducement, Stork must establish: (1) a false statement of a material fact; (2) known by Defendants to be false; (3) made to induce Stork to act in reliance; (4) action by him in reliance upon the representations; and (5) which proximately caused the his injuries. Butterworth v. Quick & Reilly, Inc., 998 F. Supp. 1404, 1410-11 (M.D. Fla. 1998)(citations omitted).

In Butterworth, defendant failed to register and file the appropriate address change for one of its branch offices in compliance with the Florida Securities Act, thereby violating certain security laws. Id., at 1406-07. Plaintiff claimed that by opening its doors, Quick and Reilly falsely represented that it had complied with all security laws and that as a result of this misrepresentation, Quick and Reilly fraudulently induced plaintiff do business with it. Id. at 1407. The Butterworth court stated that in order to succeed on the fraudulent inducement claim, plaintiff must prove ". . . both actual causation ('transaction causation') and proximate causation ('loss causation')."[11] Id. at 1411. The court reasoned that while plaintiff may be able to show that the misrepresentation caused her to invest, ". . . she will be unable to show that the misrepresentation was the proximate cause of her losses." Id.   First, after plaintiff learned of the failure to register, she did not remove her investments from defendant's firm, which the court

---

[11] "Transaction causation is established by proof that the misrepresentation induced the plaintiff to invest , while loss causation requires the plaintiff to 'prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, was responsible for his loss'" Id., quoting, In re Cascade Intern. Securities Litigation, 840 F.Supp 1558, 1579-80 (S.D. Fla. 1993).

found highly unlikely to show that plaintiff would have acted differently had she known the truth regarding defendant's failure to file a change of address form.  Id.  Second, even if plaintiff establishes she would have acted differently had she known the truth, the court found " . . . she has not established that this 'untruth was in some reasonably direct, or proximate, way responsible for [her] loss.'"  Id., *quoting*, In re Cascade, 840 F.Supp at 1584.  Accordingly, summary judgment was entered due to plaintiff's failure to establish damages.

In the instant case, Stork alleges that he would have exercised his rights as a shareholder to "block" the sale and protect Lydian from the adverse consequences of the Transaction had he known Lydian did not intend to purchase his shares, and that he reasonably relied upon Brown's alleged offer to purchase.  (DE-1, ¶16, 17, 52 and 53).  However, under these allegations, Stork cannot prove that Brown's misrepresentation was the proximate cause of his damages.  Id. First, after Stork learned that Brown and Lydian did not purchase his shares on August 15, 2007 as provided for in the Contract, Stork never attempted to nor did he assert a derivative claim within the four (4) years provided under Fla. Stat. §95.11(3).  Stork, despite extensive correspondence, never wrote that Lydian and Brown fraudulently induced him not to act and/or had caused him any damages.  In Stork's deposition (Ex. "T,"pp. 259-263) Stork merely says in July 2009 (almost 2 years later) that he had a binding agreement to sell.  (See also **Composite Ex. "Y."**) This makes it highly unlikely that Stork would have acted differently had he known the truth regarding Brown and Lydian's failure to purchase his shares.  Butterworth, 998 F. Supp. at 1411.  Second, even if Stork establishes that he would have acted differently by filing a derivative action to block the Transaction, he will not be able to establish that such an action would have successfully blocked the Transaction or that the Transaction itself caused a diminution in the value of his shares.  In fact, as provided for in document bates-labeled

31

Carl00915 (attached to Ex. "N" hereto), Lydian continued to repurchase shares at $17.50 post Transaction. Based upon the foregoing, Stork cannot show that the alleged misrepresentation on the part of Brown was in some reasonably direct, or proximate, way responsible for his loss. Butterworth, 998 F. Supp. at 1411; In re Cascade, 840 F.Supp at 1584.

Moreover, it was entirely unreasonable for Stork to rely upon Brown's alleged misrepresentation when he knew all the while that the Lydian board had to subsequently approve the Contract and that it had not done so. (Stork Depo. and Answers to Interrogatory No. 6., *supra*). Cibran Enterprises, Inc. v. BP Product North America, 365 F.Supp.2d 1241, 1253 (S.D. Fla. 2005). Stork's reliance is also unreasonable because he failed to file the available and appropriate demand or derivative action within four (4) years of the alleged misconduct. This is fatal to Stork's claim. Finally, because Brown did not have actual, implied or apparent authority to bind Lydian and because the Lydian Board did not approve or ratify the Contract as detailed above, the Contract is void and unenforceable. See *supra*; see also Cibran 365 F.Supp.2d at 1253 (fraud cannot be the basis of a fraudulent inducement action if the underlying contract is unenforceable). Accordingly, summary judgment should be entered on Stork's claim because he failed to establish loss causation, because his reliance was unreasonable based upon his admitted knowledge of Brown's limitations in binding Lydian, and because the Contract is void and unenforceable.

## CONCLUSION

For the reasons stated above, Defendants request this Court to grant their Motion for Summary Judgment on Counts I, II, and III.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified by CM/ECF on this 14th day of October, 2011:

Respectfully submitted,

**BURMAN, CRITTON, LUTTIER**
**& COLEMAN, LLP**
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
(561) 842-2820 - Ph
(561) 844-6929 – Fax

By:  /s/ Michael J. Pike.Esq
     **Robert D. Critton, Jr.**
     Florida Bar No: 224162
     **Gregory W. Coleman**
     Florida Bar No: 846831
     **Michael J. Pike**
     Florida Bar No: 617296
     **Dean T. Xenick**
     Florida Bar No: 479550

     *Counsel for Defendants*
     rcrit@bclclaw.com
     gcoleman@bclclaw.com
     mpike@bclclaw.com
     dtx@bclclaw.com

## SERVICE LIST

Amy S. Rubin, Esquire
Fox Rothschild, LLP
222 Lakeview Ave., Ste 700
West Palm Beach, FL 33401
561-835-9600
arubin@foxrothschild.com

Elliot Hallak, Esquire
Fox Rothschild, LLP
222 Lakeview Ave., Ste 700
West Palm Beach, FL 33401
561-835-9600
ehallak@foxrothschild.com

Miles J. Feldman, Esquire
Raines Feldman, LLP
9720 Wilshire Blvd., 5th Floor
Beverly Hills, CA 90212
Tel: 310-440-4100
Fax: 310-765-7732
mfeldman@raineslaw.com

Randal Ivor-Smith, Esquire
Raines Feldman, LLP
9720 Wilshire Blvd., 5th Floor
Beverly Hills, CA 90212
Tel: 310-440-4100

Sonia Y. Lee, Esquire
Raines Feldman, LLP
9720 Wilshire Blvd., 5th Floor
Beverly Hills, CA  90212
Tel:  310-440-4100
Fax:  310-765-7732
slee@raineslaw.com

Fax:  310-765-7732
rivorsmith@raineslaw.com