# UNITED STATE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### PALM BEACH DIVISION

### Case No.  9:10-CV-80962-WPD-LSS

CARL STORK, an individual,

        Plaintiff,

    v.

LYDIAN TRUST COMPANY, a Florida
corporation; RORY A. BROWN, an
individual; CLARK JOHNSON, an
individual; JOHN PURCELL, an individual;
DANIEL STANTON, an individual, and
DOES 1 through 20, inclusive,

        Defendants.

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

## JUDGMENT ON COUNTS I, II, AND III

## **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 2

III.    ARGUMENT .......................................................................................................... 3

        A.     Standard For Summary Judgment ................................................................ 3

        B.     Count II For Fraudulent Inducement And Count III For Breach Of
               Fiduciary Duty Are Direct Claims Specific To Stork. ................................ 4

               1.    Stork has alleged direct claims against Defendants in the
                     complaint. ............................................................................................ 4

               2.    The evidence supports a direct claim against Defendants. ..................... 10

        C.     As Stork Has Not Alleged Any Derivative Claim, There Is No
               Misjoinder Of Claims. ............................................................................. 13

        D.     Triable Issues Of Fact Exist As To Whether Defendants Acted In
               Bad Faith Or in Conscious Disregard Of Stork's Rights Such That
               They Are Liable Under Count III .............................................................. 14

               1.    Triable issues of fact exists as to whether the Defendants
                     acted in good faith. ............................................................................. 14

               2.    There is a triable Issue of fact as to whether Defendants are
                     liable under Florida Statute Section 607.0831 ...................................... 22

        E.     As To Count I, There Is A Triable Issue Of Fact As To Brown's
               Authority To Enter Into The Written Letter Agreement With Stork. ................. 23

IV.     CONCLUSION ...................................................................................................... 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Calderone v. United States*,
  799 F.2d 254 (6th Cir. 1986) ......................................................................... 3

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 325, 106 S.Ct. 2548 (1986) ................................................. 3, 4

*Citibank v. Data Lease Fin. Corp.*,
  828 F.2d 686 (11th Cir. 1987) .................................................................... 4, 5

*City Nat. Bank of Detroit v. Basic Food Industries, Inc.*,
  520 F.2d 336 (5th Cir.1975) ......................................................................... 23

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*,
  838 F.2d 268 (8th Cir. 1988) ......................................................................... 4

*Cottle v. Storer Communications, Inc.*,
  849 F.2d 570 (11th Cir. 1988) ..................................................................... 15

*Cox Enterprises, Inc. v. News Journal Corporation*,
  2008 WL 5142417 (M.D. Fla.) ................................................................ 23, 26

*Cox Enterprises, Inc. v. News-Journal Corp.*,
  469 F.Supp.2d 1094 (M.D. Fla. 2006) ......................................................... 15

*El v. Crain*,
  560 F.Supp.2d 932 (CD CA 2008) ................................................................. 3

*F.D.IC. v. Gonzalez-Gorrondona*,
  833 F.Supp. 1545 (S.D.Fla. 1993) ............................................................... 22

*Falic v. Legg Mason Wood Walker, Inc.*,
  347 F.Supp.2d 1260 (S.D. Fla. 2004) ............................................................ 4

*Fontenot v. Upjohn Co.*,
  780 F.2d 1190 (5th Cir. 1986) ....................................................................... 3

*Hayes v. Gross*,
  982 F.2d 104 (3d Cir. 1992) ........................................................................... 7

*Hodges v. Buzzeo*,
  193 F.Supp.2d 1279 (M.D.Fla. 2002) ............................................................ 9

*In re Bal Harbour Club, Inc.*,
  316 F.3d 1192 (11th Cir. 2003) ................................................................... 15

*In re Bank United Financial Corp.*,
  442 B.R. 49 (Bkrtcy. S.D. Fla. 2010) ............................................................ 6

*In re Southeast Banking Corp.*,
  827 F.Supp. 742 (S.D. Fla. 1993) ............................................................ 4, 15

*In re Sunrise Securities Litigation,*
    916 F.2d 874 (3rd Cir. 1990) ....................................................................... 9

*In re WorldCom*, Inc.,
    323 B.R. 844 (Bkrtcy. S.D.N.Y. 2005) ...................................................... 9

*Kloha v. Duda,*
    246 F.Supp.2d 1237 (M.D. Fla. 2003) ................................................. 5, 10

*Lewis v. Seneff,*
    654 F.Supp.2d 1349 (M.D. Fla. 2009) ...................................................... 7

*McCabe v. Foley*,
    424 F.Supp.2d 1315 (M.D. Fla. 2006) .................................................... 15

*National Parks Conservation Ass'n v. Norton,*
    324 F.3d 1229 (11th Cir. 2003) .............................................................. 13

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,*
    182 F.3d 157 (2nd Cir. 1999) ................................................................... 3

*NCR Corp. v. American Tel. & Tel. Co.,*
    761 F.Supp. 475 (S.D. Ohio 1991) ......................................................... 16

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,*
    210 F.3d 1099 (9th Cir. 2000) .............................................................. 3, 4

*Russ v. International Paper Co.,*
    943 F.2d 589 (5th Cir. 1991) ................................................................... 4

*Southern Calif. Gas Co. v. City of Santa Ana,*
    336 F.3d 885 (9th Cir. 2003) ................................................................... 3

*Torres Vargas v. Santiago Cummings,*
    149 F.3d 29 (1st Cir. 1998) ..................................................................... 3

*TSG Water Resources, Inc. v. D'Alba & Donovan Certified Public Accountants, P.C.,*
    260 Fed.Appx. 191 (11th Cir. 2007)............................................... 16, 21, 22

*University of Md. v. Peat Marwick Main & Co.,*
    923 F.2d 265 (3d Cir.1991) ..................................................................... 7

*Walco Investments, Inc. v. Thenen,*
    947 F.Supp. 491 (S.D. Fla. 1996) ............................................................ 6

## STATE CASES

*Aerospace Accessory Service, Inc. v. Abiseid,*
    943 So.2d 866 (Fla. 3 CA 2006)........................................................................... 22

*AmSouth Bank v. Wynne,*
    772 So.2d 574 (Fla. 1st DCA 2000) ..................................................................... 9

*Anglo American Security Fund, L.P. v. S.R. International Fund, L.P,*
    829 A.2d 143 (Del. Ch.2003) ............................................................................... 6

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1987)................................................................................ 15, 16

*Billops v. Magness Construction Co.,*
    391 A.2d 196 (Del. Supr. 1978) ........................................................................... 24

*Biltmore Motor Corp. v. Roque,*
    291 So.2d 114 (Fla. 3d DCA 1974) ...................................................................... 6

*Braun v. Buyers Choice Mortg. Corp. ex rel. McAloon,*
    851 So.2d 199 (Fla. 4th DCA 2003) ..................................................................... 9

*Brehm v. Eisner,*
    746 A.2d 244 (Del. 2000)...................................................................................... 15

*Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC,*
    993 So.2d 86 (Fla. 4th DCA 2008) ....................................................................... 23

*Cede & Co. v. Technicolor, Inc.,*
    634 A.2d 345 (Del. 1993)...................................................................................... 16

*Citizens National Bank of St. Petersburg v. Peters,*
    175 So.2d 54 (Fla. 2d DCA 1965) ......................................................................... 5

*County Waste, Inc. v. Miami Trucolor Offset Service Co.,*
    611 So.2d 38 (Fla. 4th DCA 1992) ....................................................................... 24

*Department of Ins. of State of Florida v. Coopers & Lybrand,*
    570 So.2d 369 (Fla. 3d DCA 1990) ...................................................................... 14

*Garcia v. Crescent Plaza Condominium Ass'n, Inc.,*
    813 So.2d 975 (Fla. 2d DCA 2002) .................................................................. 16, 22

*Guyer v. Haveg,*
    205 A.2d 176 (Del. 1964)...................................................................................... 23

*Hill v. Brady,*
    737 So.2d 1243 (Fla. 5th DCA 1999) .................................................................... 9

*Hinson v. Drummond,*
    98 Fla. 502, 123 So. 913 (1929) ............................................................................ 7

*Horton v. Benjamin,*
    7 Mass.L.Rptr. 700 WL 778662 (Mass.Super. 1997)............................................ 6

*Johnson v. Studstill*,
  71 So.2d 251 (Fla. Sup. Ct. 1954) ................................................................. 14

*Jones v. Tallahassee Memorial Regional Healthcare, Inc.*,
  923 So.2d 1245 (Fla. 1st DCA 2006) ............................................................. 24

*Karnegis v. Lazzo*,
  243 So.2d 642 (Fla. 3d DCA 1971) ................................................................ 14

*Karten v. Woltin*,
  23 So.3d 839 (Fla. 4th DCA 2009) ................................................................... 9

*Lensa Corp. v. Poinciana Gardens Ass'n*,
  765 So.2d 296 (Fla. 4th DCA 2000) ............................................................... 23

*Lobato-Bleidt v. Lobato*,
  688 So.2d 431 (Fla. 5th DCA 1997) ............................................................... 15

*Mallett v. Tunnicliffe*,
  102 Fla. 809, 136 So. 346 (1931) ...................................................................... 7

*McFeely v. Prudential Healthcare Plan Inc.*,
  843 So.2d 1023 (Fla. 1st DCA 2003) ............................................................. 24

*Northwest Racquet Swim and Health Clubs, Inc. v. Deloitte & Touche*,
  535 N.W.2d 612 (Minn. 1995) ........................................................................... 7

*Orlinsky v. Patraka*,
  971 So.2d 796 (Fla. 3d DCA 2007) ................................................................ 10

*Paul and Suzie Schutt Irrevocable Family Trust v. NAC Holding, Inc.*,
  283 Ga.App. 834, 642 S.E.2d 872 (Ga. App. Ct. 2007) ................................... 9

*Robbins v. Hess*,
  659 So.2d 424 (Fla. 1st DCA 1995) ............................................................... 24

*Rodriguez v. Saenz*,
  866 So.2d 184 (Fla. 5th DCA 2004) ............................................................... 14

*Sacks v. Helene Curtis Indus., Inc.*,
  91 N.E.2d 127 (Ill. App. Ct. 1950) ................................................................. 26

*Salit v. Ruden McClosky et al.*,
  742 So.2d 381 (Fla. 4th DCA 1999) ................................................................. 6

*Semoran Pines Condominium Ass'n v. Arab Termite and Pest Control of Florida, Inc.*,
  543 So.2d 417 (Fla. 5th DCA 1989) ............................................................... 24

*Smith v. Harr*,
  571 So.2d 575 (Fla. 5th DCA 1990) ............................................................... 14

*Smith v. Van Gorkum*,
  488 A.2d 858 (Del. 1985) ................................................................................. 16

*Telxon Corp. v. Meyerson*,
  802 A.2d 257 (Del. Ch. 2005) ......................................................................... 15

*Wolfe v. Am. Sav. & Loan Assoc. of Florida*,
   539 So.2d 606 (Fla. 3d DCA 1989) ........................................................................ 5


## **FEDERAL STATUTES**

Federal Rules of Civil Procedure, Rule 56(c) ........................................................ 14

Federal Rules of Civil Procedure 56(c)(1)(B) ...................................................... 3, 4

Rule of Appellate Procedure 32.1 ........................................................................... 6


## **STATE STATUTES**

Florida Statute § 607.0830(1)(a-c) ........................................................................ 22

Florida Statute § 607.0831(1) ............................................................................... 22

Florida Statute § 607.0831(1)(b)(2) ..................................................................... 15


## **OTHER AUTHORITY**

Eleventh Circuit Rules 36-2 .................................................................................... 6

Eleventh Circuit Rules 36-3 .................................................................................... 6

I.     **<u>INTRODUCTION</u>**

The Motion for Summary Judgment ("Motion") filed by defendants Rory Brown, Clark Johnson, John Purcell and Daniel Stanton (collectively, "Defendants") challenges a pleading and claims that have not been filed in this action.  Indeed, nearly two years after this lawsuit was filed by Carl Stork and with less than two months until trial, Defendants appear doggedly determined to fight a fictitious battle.

The reason for Defendants' reluctance to litigate the action actually filed by Stork is no mystery.  It is one they cannot win.

Stork's claims and allegations are not complicated.

- Lydian Trust Company ("LTC"), of which Defendants are directors, decided to sell its subsidiary, Lydian Wealth Management ("LWM").

- LTC planned to repurchase shares from various shareholders from the proceeds of the sale of LWM and Stork specifically and expressly requested to be a part of this stock repurchase plan.

- LTC is a privately-held company and the stock repurchase plan was a one-time opportunity for Stork to cash out his otherwise illiquid equity interest.

- Brown agreed and represented that Stork's shares would be repurchased by LTC as part of the stock repurchase plan.

- Brown gave Stork a written letter agreement to confirm the sale and Stork signed the agreement.

- ***<u>Brown lied to Stork</u>*** – repeatedly and continually.  LTC never had any intention of buying back Stork's shares.

- Notwithstanding Stork's unequivocal and repeated requests to sell his shares to LTC, Brown specifically omitted Stork's name from the stock repurchase plan and deliberately did not advise the remainder of the Board of Stork's requests.  Nor did Brown recuse himself despite the fact that he was a participant in the stock repurchase plan.

- Defendants, knowing that there were certain few other shareholders who wished to participate in the stock repurchase plan (*i.e.*, Stork), nevertheless failed to take the minimum of precautions or inquiry and merely rubber-stamped Brown's repurchase plan in conscious disregard of their obligations.

- Indisputably, LTC did ***<u>not</u>*** buy back Stork's shares but did buy back shares from

1

other favored shareholders.  Therefore, Stork was damaged.

Recognizing that to argue these allegations would be to lose, Defendants seek to obfuscate instead.

Pointedly ignoring the mountain of testimony and documentary evidence produced in this case and the pleading itself, Defendants contend that Stork's claims are not about LTC'S refusal to buy his shares at all.  They contend that Stork has brought an action to challenge the sale of LWM to City National Corporation ("CNC") and to challenge the allocation and distribution of the proceeds from the sale to LTC's management and other insiders.  As such, they contend that Stork's action is an improper derivative action which must be dismissed.  They further argue that their decision to sell LWM and to distribute the monies to LTC's management and other insiders are protected by the Business Judgment Rule.

Certainly, had Stork brought the claims that Defendants wished he had, Defendants' arguments may conceptually be colorable.  But, Stork did not and the arguments asserted by Defendants in the Motion are wholly inapposite.

In short, the Motion must be denied in its entirety for at least the following three reasons:

**First**, Stork's fraudulent inducement and breach of fiduciary claims are predicated upon distinct and separate damages he sustained as a result of Defendants' wrongful conduct directed at Stork.  Such claims are direct, not derivative, and have properly been brought.

**Second**, there are hotly contested, triable issues of material fact as to whether – in refusing and failing to repurchase Stork's shares in LTC – Defendants so failed to perform their fiduciary duties as directors of LTC that they are subject to personal liability.

**Third**, there are hotly contested, triable issues of material fact as to whether Brown had apparent authority to enter into the written letter agreement with Stork for the repurchase of his shares in LTC.


II.     **STATEMENT OF FACTS**

The statement of all applicable and disputed facts in support of this opposition to the Motion is set forth in full in the Separate Statement of Disputed Material Facts filed concurrently herewith.  For efficiency and to avoid waste of judicial resources, rather than duplicating the facts, Stork incorporates herein by reference his Separate Statement.

III.   **ARGUMENT**

A.   **Standard For Summary Judgment**

A motion for summary judgment provides a procedure for terminating without trial actions in which "there is no genuine dispute as to any material fact and the movant is entitled to judgment ___as a matter of law___." Fed.R.Civ.Proc. 56(a) (emphasis added). The party moving for summary judgment has both an initial burden of production and the ultimate burden as to any persuading the court that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.*

The moving party may carry its burden of production on summary judgment either by: negating (disproving) an essential element of the opposing party's claim or defense; or showing the opposing party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden of persuasion requires the moving party to establish beyond controversy every essential element of its claim or defense. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998); *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (same). "A moving party without the ultimate burden of persuasion at trial—usually but not always the defendant— [nevertheless] has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Id.*; *El v. Crain*, 560 F.Supp.2d 932, 936 (CD CA 2008) (defendant moving party must "show" lack of any genuine issue of material fact as to plaintiff's claims).

Because summary judgment is a "drastic device," cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2nd Cir. 1999). The moving party must "show" the district court that there is an absence of essential evidence to support the opposing party's case. *See* Fed.R.Civ.Proc. 56(c)(1)(B); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986). The moving party's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *Southern Calif. Gas Co.*, *supra*, 336 F.3d at 888.

A conclusory assertion that the opposing party has no evidence is insufficient: "It is not enough to move for summary judgment ... with a conclusory assertion that the (opposing party)

3

has no evidence to prove his case." *Celotex Corp.*, *supra*, 477 U.S. at 326, 106 S.Ct. at 2555.  A blanket argument that "plaintiff cannot prove its claim" is not sufficient.  *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000).  The moving party must identify the specific issue or issues on which it claims the opposing party has no supporting evidence, and demonstrate the absence of such evidence.  *See* Fed.R.Civ.Proc. 56(c)(1)(B); *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988); *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir. 1991).

Defendants cannot meet their burden because they are wrong on the law, the allegations and the evidence in this case.

**B.**    **Count II For Fraudulent Inducement And Count III For Breach Of Fiduciary Duty Are Direct Claims Specific To Stork.**

**1.**    **Stork has alleged direct claims against Defendants in the complaint.**

Defendants first contend that the Court must summarily dismiss Stork's claims for fraudulent inducement (Count II) and breach of fiduciary duty (Count III) because they are derivative claims which must necessarily be brought by and on behalf of LTC.

A derivative claim involves an injury to the corporation as a whole, one typically where the injury is a loss of corporate assets and, as a consequence, reduces the value of the corporation as a whole.  *In re Southeast Banking Corp.*, 827 F. Supp. 742, 745 (S.D. Fla. 1993).  If claims inure to the benefit of the corporation rather than to an individual shareholder's interest, the claim is derivative and, as such, the claimant can be made whole by corporate recovery.  *See Falic v. Legg Mason Wood Walker, Inc.*, 347 F.Supp.2d 1260, 1271 (S.D. Fla. 2004) (all damages claimed were those of the corporation so Plaintiffs could be made whole by any corporate recovery and their action is derivative, not direct).

A derivative claim is only appropriate if a shareholder is similarly situated to other shareholders, did not suffer a distinct injury from the other shareholders, and has the same opportunity to be made whole by a corporate recovery.  *Citibank v. Data Lease Fin. Corp.*, 828 F.2d 686, 693 (11th Cir. 1987).

It is well established under Florida law, however, that "a stockholder may bring a suit in his own right [against corporate directors] to redress an injury sustained directly by him, and which is separate and distinct from that sustained by other stockholders." *Citizens National Bank of St. Petersburg v. Peters*, 175 So.2d 54, 56 (Fla. 2d DCA 1965); *see, also, Citibank v.*

4

*Data Lease Fin. Corp.*, 828 F.2d 686, 693 (11th Cir.1987) (under Florida law, a shareholder can bring a fiduciary duty claim directly if he is not similarly situated to other shareholders); *Kloha v. Duda*, 246 F.Supp.2d 1237, 1242-43 (M.D. Fla. 2003) (same). Accordingly, Defendants' contention that breach of fiduciary duty claims against corporate directors must always be brought as a derivative claim is incorrect.

Indeed, in Florida, if a shareholder suffers an injury to his or her equity interest as opposed to the corporation's assets or stock value, it is a separate and distinct injury supporting a direct claim by the injured shareholder. *Wolfe v. Am. Sav. & Loan Assoc. of Florida*, 539 So.2d 606, 608 (Fla. 3d DCA 1989).

The case of *Wolfe* is instructive on this point. In *Wolfe*, the plaintiffs were holders of preferred stock in American Savings & Loan Association of Florida (ASL). *Id.*, at 607. They brought consolidated class actions for themselves and the remaining preferred shareholders for damages which were allegedly caused to those stockholders by a merger of ASL into other corporations. *Id.* The plaintiffs sued ASL and its officers and directors on the theories that: (1) under the terms of the merger, the preferred stock no longer bore a right of conversion into common stock and thus violated the corporation's prior agreement that the preferred carry the convertibility feature; and (2) the merger had the effect of unjustifiably decreasing the value of the preferred stock and was therefore in breach of the fiduciary duty they owed to all classes of shareholders. *Id.*

Without reaching the merits of these contentions in any way, the trial judge dismissed the actions on the ground that they could not be maintained as "direct" actions against the corporation and its officers and directors, and that they were cognizable only as derivative actions subject to the requirements of section 607.147, Florida Statutes (1987), with which the plaintiffs did not comply. *Id.*

In reversing the ruling of the trial court, the Court of Appeal found that both causes of action were direct ***and not derivative*** in nature:

> From the plaintiffs' point of view, the claims involve allegations of injury to their ***separate, individualized interests as preferred shareholders alone*** which would necessarily inure to their own benefit, rather than as is true of a derivative claim-that of the corporation itself. Carrying the argument one step further, far from requiring the corporation to make its own claim by asserting that claim on its behalf, which is the essential object of a derivative action, . . . ASL is, as to the breach of contract action, actually the adverse party which must pay it if it loses. And, with respect to the claim against the officers and directors as fiduciaries, it can in no sense be said that the corporation qua corporation has been harmed by those allegedly wrongful actions, so as to invoke the "derivative" doctrine which has as its foundation the redress of such a corporate injury. (*Id.*, at 608.)

5

*See, e.g.*, *Salit v. Ruden McClosky et al.*, 742 So.2d 381, 384-85, 389 (Fla. 4th DCA 1999) (a direct claim is proper where a shareholder suffers property damages distinct from other shareholders); *Biltmore Motor Corp. v. Roque*, 291 So.2d 114, 114-15 (Fla. 3d DCA 1974) (claim proper against directors and majority shareholders of corporation that entered into scheme directed against plaintiff, the minority shareholder, to dilute his stock); *In re Bank United Financial Corp.*, 442 B.R. 49 (Bkrtcy. S.D. Fla. 2010) (direct claim when shareholder seeks to recover for alleged breach of duty of care in connection with holding company's improvident stock repurchase and payment of dividend); *Walco Investments, Inc. v. Thenen*, 947 F. Supp. 491, 502 (S.D. Fla. 1996) (investors able to assert direct claims against fundraising conduit and primary corporation that were both culpable participants in scheme to defraud investors).[1]

The case of *Medkser v. Feingold*, 307 Fed. Appx. 262, 2008 WL 4797512 (11th Cir. 2008)[2], with facts analogous to here, provides further support.  In *Medkser*, eleven shareholder-plaintiffs filed an action against the defendants for fraud and civil conspiracy.  Specifically, the complaint alleged that defendants made knowingly false misrepresentations to plaintiffs to induce them to invest in IDT Group, a hedge fund, and in Brandaid Marketing Corporation, resulting in over $4.8 million in losses to these plaintiffs.  *Id.*, at 264.  The defendants filed a motion to dismiss under Federal Rules of Civil Procedure, Rule 12(c) on the ground that the claims were derivative and could not be asserted by the plaintiffs, which motion was granted by the trial court.  *Id.*

---

[1]     Other jurisdictions have also held that such an individualized injury to a shareholder's stake is properly direct.  *See, e.g., Horton v. Benjamin*, 7 Mass.L.Rptr. 700 WL 778662 (Mass.Super. 1997) (gravamen of plaintiffs' claimed breach of fiduciary duty was a freeze-out that twice acted to dilute plaintiffs' minority share in the company; such wrongful reduction of plaintiff's proportionate stake was a direct claim of wrongful dilution of plaintiff's stock); *Anglo American Security Fund, L.P. v. S.R. International Fund, L.P*, 829 A.2d 143 (Del. Ch.2003) (characterizing breach of fiduciary duty claims and negligent misrepresentation claims as direct, not derivative); *HLSP Holdings Corp. v. Fortune Management Inc*., 2009 WL 924538 (Del.Super. 2009) (action is direct, not derivative, because the shareholders of HLSP suffered injury separate and distinct from HLSP); *Strougo v Bassini*, 282 F.3d 162 (2d Cir. 2002) (applying Maryland law) (complaint stated a direct harm to shareholders as the loss in value of the equity positions, as opposed to a reduction in the value of the shares, is distinct from a harm to the corporation);  *Higgins v New York Stock Exch., Inc*., 10 Misc.3d 257, 806 N.Y.S.2d 339 (NY 2005) (complaints allege injuries that resulted in harm to NYSE seatholders' equity interests, as opposed to the NYSE's assets, so plaintiffs have standing to assert direct causes of actions for breach of fiduciary duty).

[2]     Citable under Rule of Appellate Procedure 32.1 and Eleventh Circuit Rules 36-2, 36-3.

The Court of Appeal reversed.  Applying Florida law, the Court found that:

> The injuries alleged in counts 1, 2, and 3 constitute ***direct injuries*** sustained by these plaintiffs. The complaint states that the defendants made intentional misrepresentations to these plaintiffs and thereby fraudulently induced them to invest their money into IDT and Brandaid which they would not otherwise have done. This is not an injury to the corporation, but to these investors, and the suit may be brought as a direct action. Although the magistrate judge characterized the allegations in the complaint as common to "all investors," this was inaccurate. ***The complaint states merely that "other investors" may have heard the misrepresentations in addition to the plaintiffs, but specifically alleges that these plaintiffs relied upon the misrepresentations and invested their money***. The claims involve direct injuries sustained by these plaintiffs based their own reliance on fraudulent statements and misrepresentations made to them. ***The fact that some other investors may also have been similarly injured does not transform these direct claims into derivative ones***. The corporate entity could not bring suit to recover the investment that these plaintiffs made relying on the fraudulent actions of the defendants; thus, these claims may be maintained in this direct action.  *Id.*, at 265 (emphasis added).

*See also*, *Hinson v. Drummond*, 98 Fla. 502, 123 So. 913 (1929) (Court permitted depositors to assert individual fraud claims against bank officers or directors; case involved officers who personally misrepresented the banks' financial position to an individual depositor, and allegations did not link the officers' conduct to injury to the bank or depositors generally); *Mallett v. Tunnicliffe*, 102 Fla. 809, 136 So. 346 (1931) (same); *University of Md. v. Peat Marwick Main & Co.*, 923 F.2d 265 (3d Cir.1991) (injury based on inducement by misleading financial statements was injury not common to all depositors thus constituting a direct rather than derivative injury);  *Hayes v. Gross*, 982 F.2d 104 (3d Cir. 1992) (affirmative and specific misrepresentations constituted an actionable claim of direct injury to the plaintiff); *Northwest Racquet Swim and Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612 (Minn. 1995) (injury incurred from specific misrepresentations affecting decision to purchase debentures was separate and distinct and not derivative of any harm to corporation).

> ***Defendants do not dispute the law***.

They admit that, if Stork suffered an injury separate and distinct from any injury sustained by other stockholders of the company, his claims are direct and Defendants' arguments must fail.  *See*, Motion, at 19-20, *quoting*, *Lewis v. Seneff*, 654 F. Supp. 2d 1349, 1361-62 (M.D. Fla. 2009).  Instead, Defendants make conclusory arguments that the claims must be dismissed because the allegations in the Complaint supposedly show that Stork is claiming injuries sustained by the corporation.

To the contrary, the gravamen of Stork's claims – as pleaded in the operative complaint – is that he alone was distinctly and directly injured when Brown lied to him and Brown and the

rest of the Board consciously and specifically excluded him from a Stock Repurchase Plan that robbed Stork of a one-time, promised opportunity to sell his otherwise illiquid shares in the corporation.

The allegations in this case are straightforward:

- Stork was a client of and shareholder in LTC. "Defendants defrauded Stork out of millions of dollars." (Complaint, ¶ 10.)

- Stork invested millions of dollars in LTC and acquired 434,000 shares – more than 5% of the company. (Complaint, ¶ 22.)

- Thereafter, LTC sold LWM to CNC for $112 million. Stork was concerned about the terms of the sale and was prepared to exercise his rights as a shareholder and block the sale. (Complaint, ¶¶ 30, 34.)

- When Stork raised his concerns to Brown, Brown fraudulently represented and agreed that LTC would repurchase Stork's shares for $17.50 per share – for a total purchase price of $7,595,000 – from the proceeds of the sale of LWM. (Complaint, ¶ 35.)

- LTC provided Stork with a written letter agreement memorializing the deal and, relying upon Defendants' promises and assurances, Stork signed the letter agreement. (Complaint, ¶ 36.) Based upon LTC's agreement to repurchase his shares, and believing he would no longer own any shares in LTC, Stork did not raise any objection to the sale of LWM. (*Id.*, ¶ 37.)

- The sale of LMW to CNC closed in May 2007. On or about May 17, Defendants approved the repurchase of shares from certain favored LTC shareholders and excluded Stork. Contrary to Defendants' representations and agreements, however, Stork's shares were not repurchased. (Complaint, ¶ 39.)

- Stork was therefore damaged. (Complaint, at pp. 12, 13.)

Stork does not allege any injury to the corporation. To the contrary, as repeatedly testified to by Defendants, LTC did not suffer any injury: its assets were not depleted or destroyed, and its stock price did not fall – because Stork was denied the ability to liquidate his shares. Nor does he allege an injury to other shareholders – who did not request a chance to sell their shares, were not falsely promised the opportunity to do so and were not given a written agreement for the sale of their shares.

Further, despite Defendants' futile efforts to persuade this Court otherwise, Stork ***does not challenge the sale of LWM to CNC***. Stork also does not challenge the distribution of

8

monies from proceeds from the sale of LWM *except* insofar as $7,595,000 of the proceeds, which was promised to Stork for the repurchase of his shares, were not allocated or distributed for that purpose. In that regard, the sale of LWM to CNC is merely the backdrop against which Stork requested to sell his shares in LTC and Defendants misrepresented and falsely agreed that they would purchase those shares.

The only actions – or inactions – Stork challenges in this case are:

- Defendants' refusal to comply with the terms of the written contract ***entered into between LTC and Stork*** for the repurchase of Stork's shares;

- Defendants' misrepresentations ***made to Stork*** – and no other shareholder – regarding the repurchase of Stork's shares; and

- Defendants' failure to take the requisite precaution, investigation and diligence as to the repurchase of ***Stork's shares in LTC***.

Unquestionably, these claims are based upon separate and distinct injuries suffered by Stork.

For that reason, the cases cited and relied upon by Defendants are inapposite and have no place in this analysis. *See, e.g. AmSouth Bank v. Wynne*, 772 So.2d 574 (Fla. 1st DCA 2000) (claims by corporate directors against corporation's bank that provided certain misinformation to corporation are derivative); *Paul and Suzie Schutt Irrevocable Family Trust v. NAC Holding, Inc.*, 283 Ga.App. 834, 642 S.E.2d 872 (Ga. App. Ct. 2007) (action by minority shareholders to block the merger of corporation is derivative action); *In re WorldCom*, Inc., 323 B.R. 844 (Bkrtcy. S.D.N.Y. 2005) (a derivative action brought under Delaware law claim against directors for mismanagement of corporation that resulted in diminution of value of shares); *In re Sunrise Securities Litigation*, 916 F.2d 874 (3rd Cir. 1990) (plaintiffs' claim of fraudulent inducement is based on allegations that defendants made misrepresentations in "publicly disseminated materials" and claimed injuries to entire corporation and thus stated a derivative claim); *Karten v. Woltin*, 23 So.3d 839 (Fla. 4th DCA 2009) (claim for waste of corporate funds or usurping corporate opportunity is derivative); *Braun v. Buyers Choice Mortg. Corp. ex rel. McAloon*, 851 So.2d 199 (Fla. 4th DCA 2003) (claims based upon directors' breach of fiduciary duty in selling corporation to third party are derivative); *Hill v. Brady*, 737 So.2d 1243 (Fla. 5th DCA 1999); *Hodges v. Buzzeo*, 193 F.Supp.2d 1279 (M.D.Fla. 2002) (plaintiff alleged that defendant directors' actions adversely affected the corporation's business, *e.g.*, theft of clients, employees and vendors for competing business; such claims are derivative); *Kloha v. Duda*, 246 F.Supp.2d 1237 (M.D.Fla. 2003.) (minority shareholder alleged she suffered diminution in value of her

9

stock shared equally with other shareholders, precluding direct as opposed to derivate suit); *Orlinsky v. Patraka*, 971 So.2d 796 (Fla. 3d DCA 2007) (a claim for corporate waste for illicit distributions or transfer of corporate assets is a derivative claim for breach of fiduciary duty).

1.     **The evidence supports a direct claim against Defendants.**

As set forth in detail in the Separate Statement of Disputed Facts filed concurrently herewith, the evidence in this case overwhelmingly and conclusively demonstrates that Stork was ***directly, separately and distinctly injured*** by Defendants' conduct.

A summary of the pertinent facts is as follows:

In or about 1999, Stork invested approximately $2,300,000 in First Virtual, Inc., predecessor to LTC and also became a member of the Board of Directors for First Virtual. Thereafter, Stork invested an additional $1,000,000 and ultimately acquired 434,000 shares in LTC, approximately 5% of the company. (Sep. Stmt. Nos. 1a-b, 2a-b.) Stork continued to serve on the Board of Directors for LTC until Brown caused him to be removed from the Board in 2006. (Sep. Stmt. No. 3b-c.)

As of 2005, LTC owned three subsidiaries: Lydian Private Bank, Lydian Data Services and LWM. At the time, LWM included Fortigent, a division that provided back office and other services for LWM. By far, the two most profitable divisions for LTC were Lydian Private Bank and LWM. Both Lydian Data Services and Fortigent – as a division for LWM – were operating at losses. (Sep. Stmt. No. 3.)

In December 2005, the Board of Directors for LTC approved a resolution to sell LWM. (Sep. Stmt. No. 3a.) From December 2005 to May 2007, the management and Board of Directors for LTC engaged in various negotiations and discussions to attempt to sell LWM. In December 2006, LTC received a letter of intent from City National Corporation ("CNC") for the purchase of LWM. In January 2007, LTC received a revised letter of intent from CNC for the purchase of LWM, which LOI was accepted by LTC. (Sep. Stmt. No. 5.)

On March 27, 2007, CNC and LTC made a public announcement regarding the sale of LWM. Even though Stork was a significant founding investor in LTC, Stork was not advised of the potential sale of LWM at any time by LTC and only learned of the fact of the sale through another shareholder and the internet via the public announcement. (Sep. Stmt. No. 11.)

What Stork learned about the transaction gave him great concern and on or about April 3, 2007 – less than a week after learning of the proposed sale, Stork contacted Brown to discuss the same. During the call, Stork learned that LTC intended to repurchase shares held by certain shareholders from the proceeds from the sale of LWM. Stork expressly advised Brown during

10

this conversation that Stork also wished to have his shares repurchased by LTC as part of the repurchase plan from the sale of LWM.  Brown agreed that Stork would be part of the stock repurchase plan and further told Stork that the share repurchases would be done by a letter agreement sent by Christopher Boldman, who was the general counsel for LTC from 2001 to June 2011.  (Sep. Stmt. No. 11a-b.)

Stork followed up the phone call with an email dated April 5, 2007 in which he unequivocally stated that, "I want to formally request to sell all my shares in Lydian Trust Company as part of the share buyback from the proceeds of the sale of the Lydian wealth management business.  Please send me the paperwork necessary to effect the sale." The same day, Brown made clear that Stork's shares would be repurchased from the proceeds of the sale of LWM and confirmed that Chris Boldman will follow up with documentation.  (Sep. Stmt. No. 11c.)

By April 23, 2007, however, Stork still had not received the requested paperwork. Accordingly, Stork sent another email to Brown again clearly stating, "I have not received the paperwork to sell my shares.  I want the opportunity to sell my shares as part of the LWM transaction as given to any other shareholder."  The same day, Brown forwarded an email to Boldman, copying Stork, asking Boldman to see Brown "regarding Stork and selling stock." (Sep. Stmt. No. 11d.)

Between April 23 and 24, 2007, Stork and Brown engaged in numerous email correspondences during which Stork continued to request that Brown send the paperwork to effectuate the repurchase of Stork's shares from the proceeds of the LWM sale.  Thereafter, in the latter part of April, Stork had another conversation with Brown during which Stork again raised his concerns about the sale to CNC.  Brown assured Stork that he need not worry and that Stork's shares would be purchased as part of the stock repurchase plan from the proceeds of the sale of LWM at a price of $17.50 per share.  (Sep. Stmt. No. 11e.)

Thereafter, LTC finally sent the requested paperwork, in the form of a letter agreement, to Stork on or about April 27, 2007 – nearly a ***month*** after Stork initially requested to have LTC repurchase his shares.  The letter agreement specifically states that Stork agrees to sell and LTC agrees to purchase all of Stork's shares in LTC, 434,000 shares, at a per share value of $17.50 for the total purchase price of $7,595,000.  The proposed closing date for the transaction as set forth in the letter agreement was August 15, 2007.  The agreement also specifically provided, "Please indicate your agreement to the foregoing by signing below and returning the letter, ***whereupon this letter shall constitute the binding agreement of the each Purchaser and Seller***."  (Sep.

11

Stmt. No. 11f.)

Upon receipt of the letter agreement, Stork sent an email to Boldman inquiring about the proposed closing date.  Stork expressly wrote, "it contemplates a sale in August.  What is the reason for the four month delay?  ***My understanding is that the City National sale is a cash transaction and will close sooner.  Is the same delayed closing offered to other shareholders selling now***?"  In response, Boldman merely stated that the LTC board has not yet approved the stock repurchase plan, which they anticipate happening on May 17, 2007 and that, because of the number of shares being repurchased, the transaction has to be approved by the OTS, which they anticipate will happen in August.  Boldman never stated that Stork is not part of the stock repurchase plan or that LTC does not intend to repurchase Stork's shares as part of the LWM transaction.  (Sep. Stmt. No. 11g.)

Based upon these representations and assurances, Stork signed the letter agreement and returned it to LTC.  From April 2007 to the proposed closing date in August 2007, no one ever advised Stork that he was not part of the stock repurchase plan or that his shares would not be repurchased by LTC.  To the contrary, Brown continued to represent to Stork that he had been included in the stock repurchase plan and that the Board had approved the plan.  And on October 1, 2007, Boldman sent an email to Stork stating, in pertinent part, "Call me when you get a chance, I wanted to bring you up to speed on the ***repurchase of your shares***."  (Sep. Stmt. Nos. 11h-i.)

In reliance on the representations, Stork made no attempt to press his concerns or to interfere with the sale or to alter its terms.  As testified to by Nesvold, the purported wealth management expert, had Stork taken any action to block the sale of LWM to CNC or to impede the sale, the CNC transaction would not have gone through.  (Sep. Stmt. No. 11j.)

The sale of LWM to CNC closed on May 1, 2007 for a face price of $125 million.  On May 17, 2007, Brown presented to the Board of Directors a Stock Repurchase Plan that contemplated repurchasing shares from certain shareholders in the total amount of $42,273,227.50 from the projected net proceeds from the sale in the amount of $43,529,180.  Unbeknownst to Stork, and contrary to the representations and agreements made by Brown, Stork's shares were not included in the Stock Repurchase Plan.  Although the Board of Directors were aware that there were other shareholders who had requested to have their shares be repurchased as part of the Stock Repurchase Plan, the Board rubber-stamped Brown's proposal without any question, investigation, inquiry or discussion.  (Sep. Stmt. No. 6.)

Brown now admits that LTC never intended to repurchase Stork's shares.  Brown did not

inform Stork of this fact, however, until late 2008.  In yet another false statement, Brown claimed that Stork's shares would not be repurchased by the company because after everything was calculated there just was not enough money to buy his shares.  In truth, LTC had an additional $28 million from the proceeds from the sale of LWM with which to purchase Stork's shares.  As testified to by Brown, the $28,509,182 in taxes earmarked from the proceeds of the sale to be paid as taxes on the transaction *was never paid*.  The money stayed with LTC because the company had sufficient tax losses to offset the amount.  (Sep. Stmt. Nos. 11dd, 15.)

Brown advised Stork that, notwithstanding LTC's failure to repurchase Stork's shares, he need not worry because (according to Brown) LTC was financially healthy and they would find a buyer for his shares.  Being without any other alternative, Stork relied on Brown's assurances and Brown continued to string Stork along for several more months with his empty promises.  (Sep. Stmt. No. 15.)

Stork did not learn of Defendants' true intentions until 2009 when Stork finally obtained LTC's corporate records as to the Stock Repurchase Plan and when Brown finally told Stork that there would be no sale of his shares to anyone because there are no buyers.  (Sep. Stmt. No. 15a.)

Stork was injured because as a requesting shareholder he was denied a liquidity event for his specific shares, an event that was given to a select few favored shareholders.  Accordingly, Stork's injury relates to the purchase of his specific equity interest and not the assets of LTC as a whole.  His injury was specific to him as one of the few requesting shareholders who were excluded from the Stock Repurchase plan.  Stork's loss of the opportunity to sell his particular shares cannot be viewed as a loss of, or injury to, LTC.  (Sep. Stmt. Nos. 28-30.)

Based upon these facts, Stork's claims are indisputably direct and the Motion must be denied as to Counts II and III.

## C.   As Stork Has Not Alleged Any Derivative Claim, There Is No Misjoinder Of Claims.

Defendants also argue that Counts II and III must be dismissed in their entirety because Stork misjoined his direct and derivative claims.

It is axiomatic that at the summary judgment stage of litigation, a court is obliged to consider not only the pleadings, but to examine the evidentiary record as a whole.  *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003).  *Federal Rules of Civil Procedure*, Rule 56(c) requires the court to consider "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any," in adjudicating a summary judgment motion.

Florida law also liberally construes allegations and evidence in favor of the party opposing summary judgment. *Johnson v. Studstill*, 71 So.2d 251, 252 (Fla. Sup. Ct. 1954) (movant must overcome any reasonable inferences, doubts and conclusions, all of which are to be liberally construed in favor of the party opposing summary judgment); *See also*, *Smith v. Harr*, 571 So.2d 575, 577 (Fla. 5th DCA 1990) (same); *Rodriguez v. Saenz*, 866 So.2d 184, 186 (Fla. 5th DCA 2004) (same).

As set forth above and in the concurrently filed Separate Statement of Disputed Facts, based upon the pleadings and evidence, Stork has not alleged any derivative claims against Defendants.

Even had Stork filed both derivative and direct claims against Defendants, such a "misjoinder" of claims does not require dismissal of the claims. Rather, as Defendants' own cases make clear, "[w]here causes of action are improperly joined, the ***court must direct the party to elect the action it wishes to pursue*** and dismiss the improperly joined action without prejudice to the party to commence separate cause of action on the dismissed claims." Motion, at 24, *citing*, *Department of Ins. of State of Florida v. Coopers & Lybrand*, 570 So.2d 369, 371 (Fla. 3d DCA 1990); *Karnegis v. Lazzo*, 243 So.2d 642, 643 (Fla. 3d DCA 1971).

Assuming, *arguendo*, there has been any misjoinder – which there has not – Stork elects to pursue his direct claims.

### D.   Triable Issues Of Fact Exist As To Whether Defendants Acted In Bad Faith Or in Conscious Disregard Of Stork's Rights Such That They Are Liable Under Count III.

Lastly, Defendants seek summary judgment as to Stork's breach of fiduciary duty claim against Defendants on the ground that their actions as members of LTC's Board of Directors are shielded by the Business Judgment Rule under common law and Florida statute.

The argument too is untenable.

### 1.   Triable issues of fact exists as to whether the Defendants acted in good faith.

As Defendants note, the Business Judgment Rule is merely a ***presumption*** that "in making a business decision the directors of a corporation acted on an informed basis, in good

14

faith and in the honest belief that the action taken was in the best interests of the company."
*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1987)[3], *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *see*, Motion, at 26, *quoting, Cottle v. Storer Communications, Inc.*, 849 F.2d 570, 574 (11th Cir. 1988); *In re Southeast Banking Corp.*, 827 F.Supp. 742 (S.D. Fla. 1993).

   Notably, however, the presumption is not conclusive.  It may be and is overcome by a showing that:

   •  A director abused his discretion, engaged in fraud or illegality or acted in bad faith.  *See*, *e.g.*, *In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003) (affirming dismissal of petition for bankruptcy because Board acted in bad faith when filing bankruptcy and was not protected by the Business Judgment Rule);  *Lobato-Bleidt v. Lobato*, 688 So.2d 431 (Fla. 5th DCA 1997) (Board's approval of a buy back provision allowing the company to repurchase its shares to ensure that a creditor would get nothing if he acquired the stock, was an act in bad faith and precluded application of the Business Rule).

   •  A director acted in his own self-interest.  *See*, *e.g.*,  Fla. Stat. § 607.0831(1)(b)(2) (director's breach was a transaction from which the director derived an improper personal benefit, either directly or indirectly); *Cox Enterprises, Inc. v. News-Journal Corp.*, 469 F.Supp.2d 1094 (M.D. Fla. 2006) (Business Judgment Rule does not "serve as a shield for those who…have acted in their own personal self-interest"); *McCabe v. Foley*, 424 F. Supp.2d 1315 (M.D. Fla. 2006)  ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or will suffer a detrimental impact from the proposed transaction").

   In that regard, the Business Judgment Rule will not apply to other Directors if they are dominated or controlled by that interested director.  *See*, *e.g.*, *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. Ch. 2005) (If only one director is interested, a plaintiff can negate the Business Judgment Rule with  respect to a board decision by showing that the interested director controls or dominates the board as a whole); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 358 (Del. 1993) (proving that disloyal director either dominated the board or in some way tainted the presumed independence of the remaining board members voting to approve the challenged transaction rebuts the Business Judgment Rule).

---

[3]  Florida courts regularly rely upon Delaware corporate law to establish and construe Florida corporate law.  *International Ins. Co. v. Johns*, 874 F.2d 1447, 1459 fn. 22 (11th Cir. 1989).

•     A director failed to make a fully informed decision and failed to consider the consequences of his actions, or where the director knew of wrongdoing or potential harm and failed to act accordingly.  *See, e.g., Aronson*, *supra*,  473 A.2d at 812 (A board's decision will not be protected by the business judgment rule if there is proof that the directors "acted so far without information that they can be said to have passed an unintelligent and unadvised judgment"); *Smith v. Van Gorkum*, 488 A.2d 858 (Del. 1985) (No Business Judgment Rule protection where directors did not adequately inform themselves as to the CEO's role in forcing the sale of the Company and in establishing the per share purchase price); *see also*, *NCR Corp. v. American Tel. & Tel. Co.*, 761 F.Supp. 475, 495 (S.D. Ohio 1991) (liability where "the board was not acting in an informed capacity," was "unaware of key information," and "failed to ask questions, consider certain consequences or examine the plan with a critical eye").

More problematic for Defendants, whether the presumption has been overcome is a ***question of fact*** that will defeat a motion for summary judgment.  *TSG Water Resources, Inc. v. D'Alba & Donovan Certified Public Accountants, P.C.*, 260 Fed.Appx. 191 (11th Cir. 2007) (the facts presented "at a minimum demonstrate a genuine issue of material fact as to whether [the director] acted in bad faith or abused his discretion and are sufficient to defeat a motion for summary judgment"); *Garcia v. Crescent Plaza Condominium Ass'n, Inc.*, 813 So.2d 975, 978 (Fla. 2d DCA 2002) (reversing summary judgment based on the business judgment rule because "[i]f the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper").

Here, the evidence – set forth in full in the concurrently filed Separate Statement of Disputed Facts, and summarized herein – at a minimum, creates a triable issue of fact as to whether the presumption can be overcome as to Defendants, and each of them.

As set forth above, Brown made repeated and continued misrepresentations to Stork that he would be a part of the Stock Repurchase Plan and that his shares would be repurchased by LTC from the proceeds of the LWM Sale.

While falsely assuring and lying to Stork, Brown, in bad faith and in a blatant abuse of his authority, presented a Stock Repurchase Plan to the Board of Directors for LTC that expressly excluded Stork.  In further abuse of his authority, the Stock Repurchase Plan presented by Brown did, however, include LWM clients and affiliates, LWM and Fortigent employees, Brown's longtime friend and Brown.  (Sep. Stmt. No. 11k.)

16

Brown presented the Stock Repurchase Plan to the Board by claiming that the repurchase of the shares of LWM clients, LWM employees and Fortigent employees were required as a deal term by CNC.  (Sep. Stmt. Nos. 11k-n.)  These representations were sheer fabrication.  CNC did not require the repurchase of any shares by LTC as a term for the sale of LWM to CNC.  (Sep. Stmt. Nos. 11k-n.)  Rather, Steve Lockshin and Brown negotiated a deal – without any requirement or agreement by CNC – for LTC to repurchase the shares of not only departing LWM employees but those Fortigent employees who were staying with LTC.  (Sep. Stmt. No. 11m.)  Further, Lockshin requested – and Brown agreed without any requirement by CNC – that LWM clients, who became investors through LWM, and not through First Virtual or CMS, be given preferential treatment and that their shares be repurchased by LTC first before anyone else. (Sep. Stmt. No. 11m.)

Brown also represented that, under the Stock Repurchase Plan, the shares would be repurchased in chronological order as they appeared on LTC's list of shareholders wishing to sell.  This representation was likewise false.

As admitted by Brown, the LWM customers' shares were not purchased pursuant to any "chronological order" on a list of all shareholders wishing to sell their shares.   The list had nothing to do with why their shares were repurchased by LTC.  In fact, had their names appeared on such a list, it was mere "coincidence."  (Sep. Stmt. No. 11n.)

The LWM clients who had their shares repurchased by LTC from the proceeds from the sale of LWM did not have their names on the list prior to the public announcement of the sale of LWM in March 2007.  No one can recall when the LWM clients were even given the option to sell their shares but, without dispute, the clients were not even contacted about the sale of LWM to CNC until **_after_** the public announcement of the sale on March 27, 2007.  (Sep. Stmt. No. 11n.)  Clearly, they were simply given preferential treatment.  (Sep. Stmt. No. 11n.)

Moreover, even though the Stock Repurchase Plan required LTC to "first repurchase shares from those investors who were brought to the company through Lydian Wealth Management or its predecessor," the Stock Repurchase Plan contained those shareholders who did not meet this requirement.  By way of example, under the plan, Kellett Partners was to have 494,714 shares repurchased by LTC in the amount of $8,657,495.00 from the proceeds from the sale of LWM.  Kellett Partners, like Stork, had acquired their interest in LTC through First Virtual just like Stork, not through LWM or CMS, and should not have been part of the repurchase plan.  (Sep. Stmt. No. 11o.)  Likewise, John Cunningham, who acquired his shares

through First Virtual, was to have 113,757 shares in the amount of $1,990,747.50 repurchased by LTC from the proceeds from the sale of LWM.  (Sep. Stmt. No. 11o.)

Further, under the Stock Repurchase Plan, LTC was to repurchase the shares of Gary W. Sledge, 25,000 shares in the amount of $437,500, from the proceeds from the sale of LWM. Although listed as an "LWM client" in the plan, Sledge in fact was **_not_** a client of LWM at the time of the repurchase.  He simply "ran the family office for Kellett."  (Sep. Stmt. No. 11o.)

Brown also represented to the Board that all of Palisade Capital's shares in LTC in the amount of $11,287,500 must be repurchased by LTC because they had previously requested to sell their shares in LTC and the Board had approved it.  The proposed repurchase was simply a "continuation" of a transaction that the Board already approved.  (Sep. Stmt. Nos. 11p-u.) Undisputedly, Palisade Capital was not an investor that was brought in through LWM or CMS and was not a client of LWM at any time.  (Sep. Stmt. Nos. 11p-u.)  Significantly, Martin Berman, a 20-year long friend of Brown's, is a principal of Palisade Capital.  (Sep. Stmt. Nos. 11p-u.)

Brown's representations were once more false.

Prior to May 17, 2007, there was no approval by the Board of Directors of LTC to repurchase all of the shares of Palisade Capital.  (Sep. Stmt. Nos. 11p-u.)  Brown requested that LTC repurchase these shares because Palisade Capital needed liquidity.  But, prior to its purchase of the shares in LTC, there was no agreement to provide Palisade Capital liquidity for their shares at its option, and Palisade was not given any special consideration to liquidate its shares at its option.  In other words, Palisade Capital was subject to the same limitations on liquidity of privately held stocks as any other shareholder of LTC.  And, Palisade Capital was aware of such limitation at the time of its investment.  (Sep. Stmt. Nos. 11p-u.)

Brown also requested that LTC repurchase Palisade Capital's shares first because Brown intended to be a part of the transaction.  As part of the repurchase of the Palisade Capital shares, Brown planned to sell 170,000 of the shares from the Brown Charitable Trust and then to purchase a like amount from Palisade Capital.  The reason Brown needed to sell the 170,000 shares from the Brown Charitable Trust was because Brown wanted to terminate the trust and liquidate its assets.  (Sep. Stmt. Nos. 11p-u.)  Although Brown was part of the repurchase plan, Brown did not recuse himself from voting on the plan.  (Sep. Stmt. Nos. 11p-u.)

Meanwhile, although Stork had requested to have his shares be repurchased from the proceeds from the LWM sale, and had signed a letter agreement to that effect prior to May 17, 2007, Brown never presented his request or discussed at the meeting approving the stock

repurchase plan.  (Sep. Stmt. No. 11w.)  Although it was common practice for Brown to inform the Board that a certain shareholder had an interest in selling his or her shares, Brown did not inform the Board of Stork's request.  The letter agreement signed by Stork was also not presented or discussed at the May 17, 2007 meeting.  (Sep. Stmt. No. 11w.)  Not coincidentally, other shareholders who had requested to have their shares be repurchased, but who were not on the repurchase plan – all inside employees and directors – *__were__* discussed at the meeting.  (Sep. Stmt. Nos. 11w-x.)

Brown as the CEO and Chairman of the Board did not act under sound and accepted board practice by failing to disclose his oral and written communications with Stork to the Board in connection with the Stock Repurchase Plan, and by failing to recuse himself from the vote on the approval of the Stock Repurchase Plan.  (Sep. Stmt. No. 26.)

Based on these facts – and others – that Brown is personally liable for breaching his duty owed to Stork is virtually uncontroverted.

The remaining Defendants are also liable for their utter failure to undertake any action to perform their duties and for their mere "rubber stamping" of Brown's "recommendations" and "proposals."  The record is replete with their dereliction of duty including, among other things, the following:

**Repurchase of LWM employees' and clients' shares:**
- The Board did not conduct any investigation to determine whether the stock repurchase plan was fair (Sep. Stmt. No. 11*l*);
- The Board did not conduct any inquiry or engage in any discussion to determine who was making the decision as to whose shares would be repurchased and or who would be included in the stock repurchase plan (Sep. Stmt. No. 11*l*);
- Although unaware, the Board did not conduct any inquiry or engage in any discussion to determine how the decision was made to repurchase how many shares from which shareholder (Sep. Stmt. No. 11*l*);
- The Board was not aware of how the price at which the shares would be repurchased was determined, yet made no inquiry to determine the same (Sep. Stmt. No. 11*l*);
- So uninformed was the Board that Johnson, who approved this plan had no recollection of any stock repurchase plan that approved the repurchase of shares from LWM clients and was not aware that LTC repurchased the shares of LWM

clients from the proceeds from the sale of LWM (Sep. Stmt. No. 11o);

- No one on the Board conducted any inquiry or investigation to determine if the repurchase of Fortigent employees', LWM clients' and LWM employees' shares was a required deal term imposed by CNC (Sep. Stmt. No. 11o);

- No one on the Board undertook any action to determine whether LWM clients were on the list to have their shares sold (Sep. Stmt. No. 11o);

- No one on the Board undertook any inquiry or investigation to determine if the shareholders on the stock repurchase plan were LWM clients at the time of the repurchase or had been brought to the company through LWM or CMS (Sep. Stmt. No. 11o); and

- Johnson merely "assumed" that the LWM clients were on the list, that they were being repurchased in order of their appearance on the list and that the LWM clients were ahead of any other shareholder who had requested to have their share repurchased by LTC (Sep. Stmt. No. 11o).

**Repurchase of Palisade Shares:**

- The Board of Directors did not engage in any discussion to determine why Palisade Capital's shares should be repurchased from the proceeds from the sale of LWM (Sep. Stmt. No. 11s);

- No one engaged in any inquiry or discussion to determine whether Palisade Capital appeared on the list of shareholders wishing to sell their shares and, if so, where they fell on the list (Sep. Stmt. No. 11s);

- Purcell did not even know prior to the May 17, 2007 meeting that Palisade Capital had requested to sell their shares at any time (Sep. Stmt. No. 11s);

- No one inquired, discussed or conducted any investigation to determine if Brown Charitable Trust had made a request to sell its shares prior to May 17, 2007 (Sep. Stmt. No. 11u);

- No one inquired, discussed or conducted any investigation to determine where the Brown Charitable Trust fell on the "chronological list" of shareholders requesting to sell their shares or whether the repurchase of its shares comported with the company's alleged procedure for repurchasing shares on a "first come, first served" basis (Sep. Stmt. No. 11u);

- The Board also did not undertake any discussion or inquiry to determine whether Brown would receive any benefit from the transaction or why he should be

20

provided liquidity to terminate his trust (Sep. Stmt. No. 11u); and

- The Board merely took what Brown represented at the Board at face value (Sep. Stmt. No. 11u).

**<u>Failure to Repurchase Stork's Shares</u>**

- Although the Board of Directors were aware that there were other shareholders who had requested to sell their shares, who were not part of the stock repurchase plan, the Board never undertook any investigation or discussion regarding the other shareholders (Sep. Stmt. No. 11y);

- The Board never contemplated, discussed or analyzed any alternative to the stock repurchase plan proposed by Brown (Sep. Stmt. No. 11y);

- No one on the Board made an inquiry as to the identities of all other shareholders who requested to sell their shares (Sep. Stmt. No. 11y); and

- No one on the Board contemplated, discussed or analyzed whether purchasing only certain shareholders' shares would be giving preferential treatment or how such a selective repurchase would affect the specific non-selling shareholders who requested to sell (Sep. Stmt. No. 11y).

Under the circumstances, pursuant to sound and accepted Board practice, Stanton, Purcell, and Johnson should have considered requesting further investigation and inquiry to determine the propriety of the Stock Repurchase plan as certain requesting shareholder(s) were to be excluded from the opportunity of participating in the Stock Repurchase Plan.  (Sep. Stmt. No. 27.)

But they did not.  Stanton, Purcell and Johnson simply approved the plan as presented by Brown without any objections.  (Sep. Stmt. No. 11v.)  That they did so is not surprising.  They were hand-selected puppets chosen by Brown who were placed on the Board merely to do Brown's bidding without challenge or question.  (Sep. Stmt. Nos. 3d-f.)

Based on the above facts, this claim cannot be decided as a matter of law.  *See, e.g.*, *TSG Water Resources, Inc.*, *supra*, 260 Fed.Appx. 191.  The jury must be presented with the evidence and must make their own determination as to whether Defendants are shielded by the Business Judgment Rule or, as the evidence overwhelmingly shows, that they were grossly and recklessly negligent in the performance of their duties.

2.      **There is a triable Issue of fact as to whether Defendants are liable under Florida Statute Section 607.0831.**

Under Florida statute, a director must discharge his fiduciary duties owed to the company's shareholders in good faith, with "the care an ordinarily prudent person in like position would exercise under similar circumstances" and "in a manner he or she reasonably believes to be in the best interests of the corporation." Fla. Stat. § 607.0830(1)(a-c).

If the director fails to do so, Florida statute expressly permits a shareholder to sue the director for personal liability.  Section 607.0831(1) states, in pertinent part:

(1)     A director is not personally liable for monetary damages to the corporation or to any other person for any statement, vote, decision, or failure to act, regarding corporate management or policy, by a director, unless:

(a)  The director breached or failed to perform his duties as a director; an

(b)  The director's breach of, or failure to perform, those duties constitutes . . . conscious disregard for the best interest of the corporation, or willful misconduct.

Fla. Stat. § 607.0831(1); *see, also, F.D.IC. v. Gonzalez-Gorrondona*, 833 F.Supp. 1545, 1556 (S.D.Fla. 1993) (liability permitted for breaches amounting to conscious disregard or willful misconduct).

Florida Statutes Section 607.0831 is the codification of the "business judgment rule." *Aerospace Accessory Service, Inc. v. Abiseid*, 943 So.2d 866 (Fla. App. 3 Dist. 2006). Therefore, whether Defendants fall within the exceptions to the statutory Business Judgment Rule is a ***question of fact*** that will defeat a motion for summary judgment. *TSG Water Resources, Inc. v. D'Alba & Donovan Certified Public Accountants, P.C.*, 260 Fed.Appx. 191 (11th Cir. 2007) (the facts presented "at a minimum demonstrate a genuine issue of material fact as to whether [the director] acted in bad faith or abused his discretion and are sufficient to defeat a motion for summary judgment"); *Garcia v. Crescent Plaza Condominium Ass'n, Inc.*, 813 So.2d 975, 978 (Fla. 2d DCA 2002) (reversing summary judgment based on the business judgment rule because "[i]f the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper").

The same facts that support Defendants' liability for breach of fiduciary duty notwithstanding the Business Judgment Rule are the same facts that support Defendants' liability under Section 607.0830(1).

At bottom, both are issues to be decided by the jury.

**E.      As To Count I, There Is A Triable Issue Of Fact As To Brown's Authority To Enter Into The Written Letter Agreement With Stork.**

Relying entirely on the case of *Cox Enterprises, Inc. v. News Journal Corporation*, 2008 WL 5142417 (M.D. Fla.), Defendants contend that the Court should dismiss, as a matter of law, Stork's first count for breach of contract because Brown did not have actual authority to enter into the written letter agreement for the repurchase of Stork's shares, that the Board of Directors of LTC never approved or authorized the agreement and that Stork was aware of the same.

Defendants' arguments are legally and factually without merit.

Brown need not have "actual" authority for the written letter agreement to repurchase Stork's shares to be valid. Rather, the agreement is valid and enforceable if Brown had "apparent authority" to enter into the agreement. *Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC*, 993 So.2d 86, 90 (Fla. 4th DCA 2008).

"Three elements are needed to establish an apparent agency: (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation." *Lensa Corp. v. Poinciana Gardens Ass'n*, 765 So.2d 296, 298 (Fla. 4th DCA 2000). A third party's reliance "must be reasonable and rest in the actions of or appearances created by the principal. . . ." *Id.* "As to acts in the ordinary course of business, courts have consistently recognized that a ***presumption of authority exists in the case of acts made or done by presidents.***" *Id.*; *see*, *City Nat. Bank of Detroit v. Basic Food Industries, Inc.*, 520 F.2d 336 (C.A.Fla. 1975) (where corporation held the chairman of its board of directors out as possessing broad managerial authority, agreement entered into by chairman is enforceable even if not authorized by the board).

Traditionally, the doctrine of apparent authority applies when a corporate official, such as a CEO or president, takes action in the name of an entity in a situation when he may lack formal authority, but where by dint of his title and other circumstantial facts the entity creates a reasonable impression that the official can bind the entity. *See, e.g., Guyer v. Haveg*, 205 A.2d 176, 180 (Del. 1964) (corporations' employees with titles such as "vice president," "director of

23

development," or "division manager" may have apparent authority to enter into contract on behalf of companies).

The question of whether an employee has apparent authority to bind a corporation is one of fact to be determined by the jury. *County Waste, Inc. v. Miami Trucolor Offset Service Co.*, 611 So.2d 38 (Fla. 4th DCA 1992). Any issue of material fact as to the apparent authority of an agent to bind a corporation to a contract will preclude summary judgment. *Id.* ("We find the record contains conflicting evidence and material issues of fact on the question of apparent authority and thus the summary judgment was improperly granted"); *see, also*, *Semoran Pines Condominium Ass'n v. Arab Termite and Pest Control of Florida, Inc.*, 543 So.2d 417 (Fla. 5th DCA 1989) (in action against two corporations for breach of contract, summary judgment was precluded because there was an issue of material fact as to whether the agent who signed the contract on behalf of the first corporation had the authority to bind the second corporation); *Robbins v. Hess*, 659 So.2d 424, 427 (Fla. 1st DCA 1995) ("Generally, the issue of agency or apparent agency is a question of fact to be determined by a jury"); *Jones v. Tallahassee Memorial Regional Healthcare, Inc.*, 923 So.2d 1245, 1248 (Fla. 1st DCA 2006) (factual uncertainty relative to apparent agency claim precluded entry of summary judgment); *McFeely v. Prudential Healthcare Plan Inc.*, 843 So.2d 1023, 1024 (Fla. 1st DCA 2003) (in Florida law, agency status is a question of fact); *Billops v. Magness Construction Co.*, 391 A.2d 196, 1999 (Del. Supr. 1978) (summary judgment is inappropriate when there are questions of apparent authority of an agent; such questions are questions of fact and are for the jury to determine).

Here, the facts demonstrate that Brown had apparent authority to enter into the written letter agreement.

- Since LTC was formed, Brown has been the CEO and Chairman of the Board for the company (Sep. Stmt. No. 15b);

- Since LTC was formed, Brown has regularly entered into agreements on behalf of LTC to repurchase the shares of various LTC shareholders (Sep. Stmt. No. 15c);

- Stork stopped serving on the Board of Directors of LTC in 2006, when he was unceremoniously removed by Brown (Sep. Stmt. No. 15d);

- Since being removed, Stork had no knowledge of any authority granted to, expanded upon or taken away from Brown by the Board (Sep. Stmt. No. 15d);

- In April and May 2007, Brown repeatedly and continually represented to Stork that LTC would repurchase Stork's shares in LTC (Sep. Stmt. Nos. 11a-j);

- In May 2007, Brown advised Stork that Boldman would send a written agreement for the repurchase of Stork's shares by LTC (Sep. Stmt. Nos. 11a-j);
- From 2001 to June 2011, Boldman was LTC's general counsel (Sep. Stmt. No. 15b);
- On April 27, 2007, Stork received the written letter agreement from Boldman. (Sep. Stmt. Nos. 11a-j.)  Stork had previously never seen the form of the agreement while serving on the Board of Directors.  (Sep. Stmt. Nos. 11a-j);
- Stork signed the agreement and returned it to LTC (Sep. Stmt. Nos. 11a-j);
- From May 2007 to August 2008, Brown repeatedly misrepresented to Stork that, pursuant to the written letter agreement, Stork was a part of the Stock Repurchase Plan which would be approved by the Board (Sep. Stmt. Nos. 11a-j);
- From May 2007 to August 2008, Stork became aware that certain shareholders who were part of the Stock Repurchase Plan had their share repurchased by LTC, confirming his understanding that the Board had approved the Stock Repurchase Plan (Sep. Stmt. Nos. 15a-f); and
- As testified by Stork, after August 2008, Stork learned for the first time that his name was not a part of the Stock Repurchase Plan and that his request to have his shares repurchased by LTC and the written letter agreement signed by him were not presented to the Board (Motion, at 12-13).

At a minimum, these facts create a triable issue of fact that precludes summary judgment.

The *Cox* case relied on by Defendants is distinguishable and does not support the Motion. In *Cox*, the president secretly entered into "golden parachute" agreements with two executive employees, which agreements were never presented to or disclosed to the board of directors. *Cox*, 2008 WL 5142417 at *4-6.  The corporation sought to set aside the agreements on the ground that they constituted corporate waste. *Id.*

The trial court determined that generally, the president or chief executive officer of a corporation does not have the power to enter into extraordinary contracts absent authorization set forth in the corporate bylaws or granted by the board of directors. *Id.*, at *7.  An extraordinary contract entered into by a corporate president may later be ratified by a corporate board of directors. *Id.*  Without such ratification, however, such contracts are considered void. *Id.*

What constitutes an "extraordinary" agreement necessarily turns in part on the business's history of conduct. *Cox*, *supra*, 2008 WL 5142417 at *7, *citing*, 2A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 597 (2008).  "The obvious inquiries are

whether the corporation entered into similar contracts in the past, and, if so, how frequently.  If the corporation has never before entered into a contract similar to the one in question, the contract would by definition be extraordinary."  *Id.*, citing, *Sacks v. Helene Curtis Indus., Inc.*, 91 N.E.2d 127, 132 (Ill. App. Ct. 1950).

The trial court determined that, in that case, the "golden parachute" agreements were extraordinary because: (1) the company had never before entered into written employment agreements, let alone lucrative severance agreements; and (2) the agreement conferred substantial benefits on the employees but no benefit on the company.  *Id.*

Of course, the facts are entirely different here.

By Defendants' own admission, LTC has regularly entered into similar agreements to repurchase shares from LTC's shareholders using the identical "form" letter agreements.  The purchase price was always the same, $17.50 per share.

Further, as Defendants contend, repurchasing the shares from Stork would have conferred substantial benefits on the company because it would have increased its capitalization and it would have increased the value of the remaining shares.  (Sep. Stmt. No. 11z.)

Summary judgment cannot be granted under these circumstances.

IV.   **CONCLUSION**

For the foregoing reasons, Stork respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety.

Date: November 11, 2011                    Respectfully submitted,

                                           FOX ROTHSCHILD LLP

                                           */s/ Amy S. Rubin*
                                           Amy S. Rubin (Florida Bar Number:  476048)
                                           arubin@foxrothschild.com
                                           222 Lakeview Avenue, Suite 700
                                           West Palm Beach, FL 33401
                                           Telephone:  561-835-9600
                                           Facsimile:  561-835-9602


                                           Miles J. Feldman
                                           RAINES FELDMAN LLP
                                           *Pro Hac Vice*
                                           mfeldman@raineslaw.com
                                           9720 Wilshire Boulevard, 5th Floor
                                           Beverly Hills, CA 90212
                                           Telephone:  310-440-4100
                                           Facsimile:  310-765-7730

                                           *Attorneys for Plaintiff*

Service List
Case No. 9:10-cv-80962-WPD/LSS
Electronically by CM/ECF System

Amy S. Rubin
arubin@foxrothschild.com
Fox Rothschild LLP
222 Lakeview Avenue, Suite 700
West Palm Beach, FL 33401
Telephone: 561.835.9600
Facsimile: 561.835.9602

Miles J. Feldman -Pro Hac Vice
mfeldman@raineslaw.com
Sonia Y. Lee -Pro Hac Vice
slee@raineslaw.com
Randal Ivor-Smith -Pro Hac Vice
rivorsmith@raineslaw.com
Michael N. Jones
mjones@raineslaw.com
9720 Wilshire Boulevard, 5th Floor
Beverly Hills, CA 90212
Telephone: 310-440-4100
Facsimile: 310-765-7730

*Attorneys for Plaintiff*

Dean Theodore Xenick
dtx@bclclaw.com
Gregory Coleman
gcoleman@bclclaw.com
Robert Deweese Critton, Jr.
rcrit@bclclaw.com
Michael James Pike
MPike@bclclaw.com
Burman Critton Luttier & Coleman
303 Banyan Boulevard, Suite 400
West Palm Beach, FL 33401
Telephone: 561.842.2820
Facsimile: 561.844-6929

*Attorneys for Defendants*